948 So.2d 725 (2007)
STATE of Florida, Petitioner,
v.
Gregg CAMPBELL, Respondent.
No. SC05-1844.
Supreme Court of Florida.
January 25, 2007.
Bill McCollum, Attorney General, Tallahassee, FL; Celia A. Terenzio, Bureau Chief, and Monique E. L'Italien, Assistant Attorney General, West Palm Beach, FL, for Petitioner.
Samuel R. Halpern, Fort Lauderdale, FL, for Respondent.
PER CURIAM.
We initially accepted jurisdiction to review State v. Campbell, 911 So.2d 192 (Fla. 4th DCA 2005), a decision by the Fourth District Court of Appeal certifying a question to this Court as one involving great public importance. See art. V, § 3(b)(4), Fla. Const. However, during oral argument, the parties conceded that the facts as outlined in the Fourth District's decision are materially different from those depicted in the trial court record. Neither of the parties filed a motion for rehearing with the Fourth District to address these materially disparate facts. We conclude that reviewing a case under such circumstances would place the instant proceeding in the procedural posture of a rehearing. This Court lacks jurisdiction to rehear a decision issued by a district court; therefore, we exercise our discretion and discharge jurisdiction. Accordingly, this review proceeding is dismissed.
It is so ordered.
LEWIS, C.J., and ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion.
WELLS, J., dissents with an opinion, in which CANTERO and BELL, JJ., concur.
PARIENTE, J., concurring.
I concur in the decision to exercise our discretion to discharge jurisdiction. The certified question is premised on the assumption that the officer retained Campbell's driver's license and obtained consent to search his car after completing the warrant check. We now know this scenario is inconsistent with the testimony during the suppression hearing. Our discretionary *726 review of district court decisions certifying questions of great public importance under article V, section 3(b)(4), Florida Constitution, is limited to decisions that rule on the questions certified. Salgat v. State, 652 So.2d 815, 815 (Fla.1995). We should not use our certified question jurisdiction to correct errors of fact on which a certified question is based and then compose our own question of great public importance based on the actual facts. Issues involving temporary detentions and warrant checks are reaching us with such frequency that it is unlikely the question certified by the Fourth District will long evade our review. See, e.g., Golphin v. State, 945 So.2d 1174 (Fla. 2006); State v. Frierson, 926 So.2d 1139 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 734, 166 L.Ed. 2d 570 (2006); State v. Baez, 894 So.2d 115 (Fla.2004); State v. Diaz, 850 So.2d 435 (Fla.2003). I would prefer to reach that question when it actually comports with the facts.
Further, I strongly disagree with Justice Wells' view that this is a case in which, assuming a Fourth Amendment violation, application of the exclusionary rule would be in question. Justice Wells relies on statements concerning the societal costs of excluding evidence as a penalty for Fourth Amendment violations in Hudson v. Michigan, ___ U.S. ___, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), and in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Neither case supports the broad rollback of exclusionary rule jurisprudence suggested in his dissent.
In Leon, the Court held that, subject to several qualifications, the exclusionary rule does not apply to evidence acquired in reasonable reliance on a search warrant later ruled invalid. 468 U.S. at 921-22, 104 S.Ct. 3405. This is a very narrow exception to the exclusionary rule, one that rests on the "detached scrutiny of a neutral magistrate, which is a more reliable safeguard than the hurried judgment of a law enforcement officer." Id. at 913-14, 104 S.Ct. 3405 (quoting United States v. Chadwick, 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)). This Court has recognized that the Leon "good faith" exception is limited to cases involving search warrants. See State v. Peterson, 739 So.2d 561, 564 (Fla.1999) ("The `good faith' exception becomes applicable only upon finding that the affidavit for a search warrant was insufficient to establish probable cause.").
In Hudson, the Court declined to apply the exclusionary rule to violations of the "knock-and-announce" rule governing residential search warrants. 126 U.S. at 2165. The Court stated:
[C]ases excluding the fruits of unlawful warrantless searches say nothing about the appropriateness of exclusion to vindicate the interests protected by the knock-and-announce requirement. Until a valid warrant has issued, citizens are entitled to shield "their persons, houses, papers, and effects," U.S. Const., Amdt. 4, from the government's scrutiny. Exclusion of the evidence obtained by a warrantless search vindicates that entitlement. The interests protected by the knock-and-announce requirement are quite differentand do not include the shielding of potential evidence from the government's eyes.
Id. (emphasis supplied) (citations omitted). Hudson concerned a Fourth Amendment violation in the execution of a valid warrant, and the Court in no way receded from application of the exclusionary rule to evidence obtained without a warrant.
This case involves a warrantless search and seizure, a situation in which evidence obtained in violation of the Fourth Amendment remains subject to suppression as "fruit of the poisonous tree" under Wong *727 Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and its progeny. In the absence of a probable cause determination by a detached magistrate, exclusion of evidence continues to vindicate persons' entitlement to the shield against government intrusion provided by the Fourth Amendment. Accordingly, I believe Justice Wells is in error in suggesting both that the exclusionary rule can be abandoned in the case of a warrantless search or seizure and that this result would be consistent with United States Supreme Court precedent.
WELLS, J., dissenting.
I do not agree with discharging jurisdiction. There is no question that this Court has jurisdiction since the case is here on a certified question by the Fourth District Court of Appeal. Art. V, § 3(b)(4), Fla. Const.
There is likewise no question that the Fourth District was in error as to material facts in the case. As the majority states, the parties agreed at oral argument before this Court that the Fourth District was in error. However, I would not ignore the error and allow the erroneous decision to stand when this Court has jurisdiction to correct it. The fact that neither party filed a motion for rehearing in the Fourth District does not affect this Court's jurisdiction.
The factual error is in the Fourth District's statement:
Campbell handed over his driver's license upon request. While two detectives stayed next to his vehicle, the third conducted a warrant check. The check came back clean, but instead of returning his license and concluding the encounter, one of the detectives asked whether Campbell had any guns or drugs in the vehicle. Campbell replied "no." The detectives then, without first returning the license, asked for consent to search. Campbell consented, and a firearm was found in the car.
State v. Campbell, 911 So.2d 192 (Fla. 4th DCA 2005). The Fourth District also states, "Here, the state does not offer justification, or articulable suspicion, explaining the deputies' failure to return Campbell's driver's license before seeking and obtaining his consent to search." Id. at 193. The transcript of the testimony at the suppression hearing does not support that the search by the law enforcement officers was after the check came back clean.
The transcript of the testimony was of law enforcement officers Patrick White and Michael Catalano. Campbell did not testify. The testimony was undisputed that Campbell consented to giving to the officers his identification, consented to the officers doing a warrant check using his driver's license, which he had given as identification, that he consented to the officers doing a search of the vehicle while the warrant check was being done, and that the search which uncovered the weapon was while the warrant check was being done. The testimony by Officer Catalano was:
Q Describe for the Court accurately as possible exact words or terminology you used back in January.
A I believe I said do, do you mind if I see your license and registration.
Q And don't you raise your voice at all?
A No. Just like a friendly conversation.
Q Did you predicate him not giving you his license on anything?
A No. I just asked him. I didn't say anything else but that.
Q In similar tone of voice that you have used here today?

*728 A Yeah.
Q And what was his response to that request?
A Very cooperative. He was no problem. He handed it over to me.
Q And what did you do with the driver's license?
A Once I took it from him I just said I'm going to check you for any warrants, or check your license. He said no problem. I went to the teletype, did so.
Q He said no problem?
A Yeah.
Q What did you do then?
A I checked him on the teletype and waited for response back from them.
Q How long was that?
A A few minutes.
Q When you say a few minutes, like thirty minutes? A minute? Less than five minutes?
A I probably didn't get it back for ten, like five to seven minutes. I will bet three to five minutes.
. . . .
Q While teletype is running did either or any of three of you get consent to search the Defendant's vehicle?
A Yes.
Q Who did that?
A I did. While I got his credentials I told him that I'll run him on the teletype. Then I said hey, while we are waiting do you mind if I check your vehicle for drugs or weapons.
Q And what did he respond?
A Very cooperative. He said no problem, you can search my vehicle.
Q How long were you searching the vehicle before firearm in this case was found?
A Ten seconds.
. . . .
Q And you began to search the car. You believe soon after the search began that's when you received the all clear from warrants and wanted check; right?
A. No. I found the weapon first, then after that 
Q Okay. So in essence while you are conducting the search theAre you all right?
A Yes. I hurt my chest other day. Thanks. I'm fine.
Q Do you want some water?
A No, I'm okay.
Q I don't want you passing out or anything.
A No, no, no. I'm fine.
Q While the wanted and warrants check was going on, that's when you began the process of searching the car; correct?
A Right.
Based upon the actual facts in the record, the trial judge decided the case on the basis of the existing Fourth District decision in Baez v. State, 814 So.2d 1149 (Fla. 4th DCA 2002), which was quashed by this Court in State v. Baez, 894 So.2d 115 (Fla. 2004), after the trial court ruled on the motion to suppress. The trial court also determined that the Fourth District's decision in Perko v. State, 874 So.2d 666 (Fla. 4th DCA 2004), was controlling.
Significantly, the trial court found that the law enforcement officers "did nothing improper." The trial court stated:
The Court finds original stop was consensual, it was a consensual encounter, but based upon once they take a driver's license, run a records check, the circumstances change. That's exactly the facts of those two cases.
Although the Court does find the officers did nothing improper, there was no display of weapons, no show of authority, that he was free to leave, nothing *729 intimidating about them. But once they took the license and ran the license, that changes things.
The trial court's statement that "once they took the license and ran the license that changes things" is an obvious reference to the Perko decision.
In Perko, the Fourth District held:
In the course of a consensual encounter, a sheriff's deputy obtained Perko's consent to conduct a search of his person after obtaining, but before returning, his driver's license while another deputy conducted a warrant check. Under these circumstances, consent was obtained after Perko had been effectively seized. Therefore, the search was unlawful and the fruits thereof must be suppressed.
Perko, 874 So.2d at 666-67. The Fourth District noted conflict with Golphin v. State, 838 So.2d 705 (Fla. 5th DCA 2003), in which the Fifth District certified conflict with Baez. The Fourth District's Baez decision was later quashed by this Court. We have now approved the decision in Golphin, Golphin v. State, 945 So.2d 1174 (Fla. 2006), following our decision in State v. Frierson, 926 So.2d 1139 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 734, 166 L.Ed. 2d 570 (2006).
In Campbell's case, the Fourth District's decision is based upon its earlier decision in Perko. Thus, the certified question should be rephrased to be whether the Fourth District's decision in Perko is correct as a bright rule requiring suppression of evidence in all cases in which there is a consensual search of a person or the person's vehicle while a computer search is being performed by an officer while holding the person's driver's license. My answer to this rephrased question is "no."
My answer begins from the premise that governs all Fourth Amendment issues in motions to suppress, which is that the rules to be applied must take into consideration the totality of the circumstances, and for the most part, per se rules are inappropriate in the Fourth Amendment context. United States v. Drayton, 536 U.S. 194, 203, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). In Florida v. Bostick, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Court made clear that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her property so long as the police do not convey a message that compliance with their request is required.
The rule of Perko that makes it ipso facto a violation of the Fourth Amendment to request and obtain consent while an officer is using a person's driver's license to make a computer examination of the driver's license information is contrary to these cases from the Supreme Court. Rather, the use of the driver's license should be only one circumstance in the determination of whether a reasonable person would feel free to decline the requests or terminate the encounter.
Here, there were other circumstances from which it could be concluded that Campbell's consent continued to be voluntary until the weapon was uncovered. One was that the record was undisputed that Campbell said that he had "no problem" with the officer checking his driver's license. Another was that the driver's license check only took five to seven minutes. A third was that the weapon was found while the check was being done and ten seconds into the search of the vehicle to which Campbell consented. I recognize that there were also countervailing circumstances to be considered, including the *730 number and positioning of the law enforcement officers.
But the trial court did not make a determination as to whether, under the circumstances, Campbell reasonably believed that he could not terminate the voluntary encounter prior to the weapon being uncovered. The trial court ruled solely on the basis of Baez and Perko, and I conclude that this was legal error. I believe this issue should be remanded to the trial court to make the decision on the basis of the totality of the circumstances without the application of the erroneous decisions of Baez and Perko.
However, even if the trial court should determine that under the totality of the circumstances of this case the search became nonconsensual prior to the uncovering of the weapon, that would not necessarily dictate that the weapon should be suppressed as evidence. The Supreme Court has also held that not every violation of the Fourth Amendment requires evidence to be suppressed. In United States v. Leon, 468 U.S. 897, 906-08, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the court said:
Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." Illinois v. Gates, [462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)]. Only the former question is currently before us, and it must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective.
The substantial social costs exacted by the exclusionary rule for the vindication of Fourth amendment rights have long been a source of concern. "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." United States v. Payner, 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains. Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. Stone v. Powell, [428 U.S. 465, 490, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)]. Indiscriminate application of the exclusionary rule, therefore, may well "generat[e] disrespect for the law and administration of justice." Id. at 491[, 96 S.Ct. 3037]. Accordingly, "[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." United States v. Calandra, supra, 414 U.S. [338] at 348[, 94 S.Ct. 613, 38 L.Ed.2d 561]; Stone v. Powell, supra, 428 U.S. at 486-487[, 96 S.Ct. 3037]; United States v. Janis, 428 U.S. 433, 447, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).
(Footnote omitted.) This view of the limits of the exclusionary rule was reiterated in the immediate past term of the Court in Hudson v. Michigan, ___ U.S. ___, ___, 126 S.Ct. 2159, 2163, 165 L.Ed.2d 56 (2006):

*731 Suppression of evidence, however, has always been our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," United States v. Leon, 468 U.S. 897, 907[, 104 S.Ct. 3405, 82 L.Ed.2d 677] (1984), which sometimes include setting the guilty free and the dangerous at large. We have therefore been "cautio[us] against expanding" it, Colorado v. Connelly, 479 U.S. 157, 166, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and "have repeatedly emphasized that the rule's `costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364-365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (citation omitted). We have rejected "[i]ndiscriminate application" of the rule, Leon, supra, at 908[, 104 S.Ct. 3405], and have held it to be applicable only "where its remedial objectives are thought most efficaciously served," United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)that is, "where its deterrence benefits outweigh its substantial social costs,'" Scott, supra, at 363[, 118 S.Ct. 2014] (quoting Leon, supra, at 907[, 104 S.Ct. 3405].)
In the present case, the trial court found that the law enforcement officers "did nothing improper." In light of that finding, I conclude that it is very questionable whether the exclusionary rule could exclude the evidence in conformity with the decisions of the Supreme Court which we are bound to follow on Fourth Amendment issues pursuant to article I, section 12 of the Florida Constitution.
I recognize that the trial judge did not make a decision on the exclusionary rule. For that reason, I would remand the issue of violation of the Fourth Amendment to the trial judge to make based upon the totality of the circumstances. If the trial judge determines that there was a Fourth Amendment violation, he should then make a determination as to whether the exclusionary rule should exclude the evidence based on the Supreme Court's decision on the exclusionary rule.
CANTERO and BELL, JJ., concur.