## Commonwealth *vs.* Christopher Banville.

Bristol. April 8, 2010. - August 13, 2010.

Present: Marshall, C.J., Ireland, Spina, Cordy, & Botsford, JJ.

*Homicide. Constitutional Law,* Search and seizure, Confrontation of witnesses. *Search and Seizure,* Warrant, Probable cause, Body examination, Buccal swab. *Probable Cause. Conflict of Laws. Evidence,* Buccal swab, Expert opinion, Hearsay, Cross-examination, Prior conviction. *Witness,* Expert, Cross-examination. *Practice, Criminal,* Capital case, Assistance of counsel, Hearsay, Confrontation of witnesses.

A criminal defendant failed to demonstrate that his trial counsel was ineffective in failing to include, in a pretrial motion to suppress evidence, a claim that the application for a search warrant in Maryland did not establish probable cause, where a commonsense, practical reading of the application for the warrant (which met the probable cause standards of Maryland law, which itself follows the analysis under the Fourth Amendment to the United States Constitution, as well as art. 14 of the Massachusetts Declaration of Rights, thus obviating any potential conflict of laws question) established a substantial basis to believe that a buccal swab, a genital swab, and pubic hair combings taken from the defendant would produce evidence that would aid in the investigation of a murder that occurred in Massachusetts [534-539]; further, the defendant failed to show that the absence of an adversary hearing on the warrant application before a Maryland judge created a substantial likelihood of a miscarriage of justice [539-540].

At a murder trial, the admission in evidence of opinion testimony given by a State police chemist, based, in part, on deoxyribonucleic acid (DNA) profiles prepared by a different chemist, did not violate the defendant's right to confront witnesses against him, where, although the DNA profiles were testimonial hearsay, they were not admitted in evidence and the testifying chemist did not testify to their contents; where the hearsay was independently admissible and was the kind of evidence experts customarily relied on as a basis for opinion testimony; and where any error in the form of the testifying chemist's opinion was waived by a failure to object and in any event did not create a substantial likelihood of a miscarriage of justice. [540-542]

There was no merit to the criminal defendant's claim that the judge at a murder trial impermissibly allowed the prosecutor to exploit evidence of the defendant's prior convictions and to use them to show propensity, where the prosecutor's use of the defendant's theft of his mother's car to flee the Commonwealth, in combination with his record of prior convictions, to argue that the defendant was not to be considered credible, was a fair juxtaposition and argument. [542]

INDICTMENTS found and returned in the Superior Court Department on June 16, 2006.

A pretrial motion to suppress evidence was heard by *Robert J. Kane*, J., and the cases were tried before *John P. Connor, Jr.*, J.

*Chrystal A. Murray* for the defendant.

*Steven E. Gagne*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. He also was convicted of larceny of a motor vehicle. On appeal he asserts (1) that counsel was ineffective for failing to move to suppress evidence derived from buccal and genital swabs taken from the defendant pursuant to a search warrant issued in Maryland that allegedly does not satisfy Massachusetts standards; (2) the admission of expert testimony based on hearsay evidence violated his right to confront and cross-examine witnesses; and (3) that the judge erred by allowing the prosecutor impermissibly to use evidence of the defendant's prior convictions to show a propensity to commit the crimes charged. We affirm, and we decline to reduce the degree of guilt on the murder conviction or order a new trial pursuant to G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of specific issues. The seventeen year old victim had made plans for an overnight visit on January 13, 2006, at the home of her maternal grandparents in Fall River. The defendant, her maternal uncle, lived in that home. He was approximately thirty-three years old at the time. The grandparents had two Labrador retrievers that reacted to strangers by barking and baring their teeth.

During the evening of January 13, the defendant complained twice to his father that the victim was talking on the telephone to a man he believed was too old for her. His father dismissed the defendant's complaints. Around midnight the grandfather went downstairs to check on the victim and the defendant. The victim was asleep on the couch in the finished basement. He did not see the defendant.

At around 2 A.M. on January 14 the grandmother was awakened by a sound similar to the alarm on her car, which she had parked

in the driveway below her bedroom window. She did not hear the dogs bark, so she went back to sleep. At about 7:30 A.M. the grandfather discovered the victim's body on the floor of the garage, which is located off the finished basement. Her hair was bloodstained, and there was a pool of blood next to her head. She was not breathing and she had no pulse. Her body was cold. She was naked, except for the shirt that had been pulled halfway up her chest. A dog leash was wrapped around her neck, and she had a wound near her right temple. A crowbar was out of place in the garage. The dogs, which regularly slept in the garage, were sitting quietly next to the victim's body. When police and emergency medical technicians arrived, the dogs began barking and baring their teeth at them. It was later determined that the victim died as a result of either a broken neck or a ligature strangulation by the dog leash around her neck.

In addition to the blood on the victim's hair and the garage floor, there was blood spatter inside the garage, blood on the couch where the victim's grandfather saw her sleeping, and blood on the wall of the stairwell leading to the upper floors of the house.

The defendant was nowhere to be found, and the grandmother's car was missing. The defendant did not have a driver's license, and he had been told he could not use the car. He knew the grandmother kept her car keys in her coat pocket, which she hung in a second-floor closet. Her car keys were missing. Her pocketbook, which she kept on the door handle of that closet, was in the basement near the couch. The money she had put inside was gone.

The missing car was equipped with a "LoJack" tracking device, which eventually led to its being stopped by a Maryland State police officer on Interstate Route 95 near Baltimore at about 3:15 P.M. on January 14, 2006. The defendant was the operator and sole occupant at the time. After he was ordered out of the car, the officer noticed what appeared to be bloodstains on the front thighs of his jeans. The defendant was placed under arrest.

Maryland State police officers removed the defendant's clothing and secured it as evidence in what they then knew was a murder investigation. The defendant's body was digitally photographed, allowing the officers to "zoom in" on the images with

the use of a computer; this revealed reddish stains around his cuticles.

On notification of the defendant's arrest, Massachusetts State Trooper William Serpa, Massachusetts State police chemist Eugene Hagan, and a Fall River police detective flew to Baltimore, arriving the evening of January 14. After conferring with the Massachusetts officers, two Maryland State police officers worked through the night on an application for a search warrant that they submitted to a Maryland District Court judge. The defendant remained at the State police barracks during this time. A search warrant issued at 6:15 A.M. on January 15 authorized them to obtain swabbings of the defendant's hands, penis, and genital area; perform a combing of his pubic hairs; and collect a sample of his deoxyribonucleic acid (DNA) by means of a buccal swab. The precise terms of the authorization are set forth later in this opinion.

Hagan executed the warrant on the defendant's person. The evidence thus collected was transported to Massachusetts, where a second State police chemist, Betsy Rabel, performed tests and found human blood on the swabs of the defendant's fingernails, pubic hair combings, and swabs of his penis. She also found human blood on the collar of his T-shirt, the front of his shirt, the left front leg of his jeans, the inner-left thigh of his jeans, the zipper of his jeans, the waistband of his boxer shorts, and his right shoe. Rabel further found human saliva in a swabbing taken from the victim's breasts, and human blood on a crowbar taken from the garage where the victim was found. Snippets and swabbings from some of these items were prepared and forwarded to the DNA unit of the Massachusetts State police crime laboratory.

Another State police chemist, Amy Barber, conducted DNA tests on the samples forwarded to her. A coworker generated complete DNA profiles of the defendant and the victim. Barber generated DNA profiles from the materials forwarded to her that she compared to the profiles of the defendant and the victim. Barber opined that the victim's DNA was present in the blood swabbed from the defendant's fingernails and penis, his shirt collar, the area of the zipper on his jeans, and the crowbar. The defendant's DNA was found in swabs of the victim's right hand fingernails, and the saliva swabbed from her breasts. Barber

opined that the probability that the DNA was that of someone else was one in 5 quadrillion as to the sample under the victim's fingernails, and one in 410 trillion as to the saliva sample.

2. *Ineffective assistance of counsel.* Trial counsel filed a motion to suppress evidence that appellate counsel asserts should have included a claim that the application for the Maryland search warrant failed to establish probable cause, as required by the Fourth Amendment to the United States Constitution, to believe that a buccal swab, genital swab, or pubic hair combings would produce evidence that would aid in the investigation of the victim's murder. The defendant further contends that he was entitled to an adversary hearing before the Maryland judge at which the judge was required to consider the seriousness of the crime, the importance of the evidence to the investigation, and the availability of less intrusive means of obtaining it. The failure of trial counsel to raise these issues in his motion to suppress, he argues, constitutes ineffective assistance of counsel.

To prevail on a claim of ineffective assistance of counsel based on grounds not raised in a motion to suppress, the defendant must show that the motion to suppress would have been successful, and that failing to bring such a motion in a case where the defendant was convicted of murder in the first degree created a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Williams*, 453 Mass. 203, 207 (2009), citing *Commonwealth v. Wright*, 411 Mass. 678, 682 (1992).

a. *Probable cause.* The affiants to the application for the Maryland search warrant were a sergeant and a detective sergeant of the Maryland State police. They indicated that the underlying matter was a murder investigation in Massachusetts, and that the defendant was operating a motor vehicle wanted in connection with that investigation. The defendant was arrested at approximately 3:30 P.M. on January 14, 2006, by Maryland State Trooper Michael Cox, who observed what appeared to be blood on the defendant's jeans. The defendant declined to consent to swabbings of his hands, genitals, and mouth for samples for DNA testing. The affiants included information they received from Massachusetts State Trooper William Serpa. Serpa prepared the information in typewritten form for inclusion in the application for the search warrant.

Serpa's statement expressly was based on statements of the named grandparents and on observations of police officers involved in the investigation. It contained essentially what has been summarized in the background section of this opinion, except that he included no information about the dogs, the victim's body being cold to the touch when found, or evidence obtained by the chemists (which occurred after the warrant issued).

Serpa provided the following additional information. The grandmother filed a stolen motor vehicle report with the Fall River police department. A stolen vehicle information report was entered into the National Crime Information Computer with a nationwide request for assistance in locating the car.

Serpa further stated that the defendant previously had been arraigned on thirty-five charges, including violent crimes of assault to kill, assault and battery by means of a dangerous weapon (several convictions), threatening bodily injury, armed assault with intent to rob, assault and battery on a public official, and using a motor vehicle without authority. Serpa stated that, based on his experience and training, "crimes of violence often involve a struggle and the use of weapons and other instrumentalities," and that persons involved "often leave evidence or trace evidence that if collected will help identify the perpetrator(s)." Such evidence, he indicated, includes bodily "fluids, blood, hair, saliva," and other substances not relevant to this analysis. Serpa opined that, based on the foregoing, "there is probable cause to believe that evidence of the crime of [m]urder . . . and [r]ape will be found within and upon [the defendant] who is currently located at the Maryland State Police Waterloo Barracks."

The search warrant issued at 6:15 A.M. on January 15, 2006. It authorized the police to (1) seize the defendant's clothing and items in his possession for forensic processing; (2) obtain his fingerprints and palm prints; (3) photograph his entire body; (4) obtain external forensic swabbings of the defendant's hands, penis, and genital area; (5) perform a combing of his pubic hairs; and (6) collect a sample of his DNA by means of a buccal swab.

The defendant argues that the application for the warrant failed to establish probable cause, as required by the Fourth Amendment. He makes no reference to art. 14 of the Massachusetts Declaration of Rights, but he relies almost exclusively

on our case law. We will consider art. 14, pursuant to our responsibilities under G. L. c. 278, § 33E. Both this issue and the next (adversary hearing) present a conflict of law question that we have never decided, but to which we alluded in *Commonwealth v. Upton*, 394 Mass. 363, 377 n.1 (1985). See 1 W.R. LaFave, Search and Seizure § 1.5(c) (4th ed. 2004).

The broad question here is whether evidence seized pursuant to a validly issued search warrant in Maryland is admissible in a criminal trial in Massachusetts if the search warrant would not have been valid if issued in Massachusetts. Of course, if there was no probable cause under Fourth Amendment standards to issue the warrant in Maryland, the evidence is not admissible anywhere. If the warrant validly issued in Maryland but would not have been valid if issued in Massachusetts, then we must address the conflict of law question to determine its admissibility in Massachusetts.[1] If the warrant would have been valid in Massachusetts, the evidence is admissible in Massachusetts, and

---

[1] At least six "archetypal cases" of this issue have been identified, depending on the law of the State where the search warrant issued, the law of the State where the prosecution occurs, and whether the Federal government is in the position of a State. Latzer, The New Judicial Federalism and Criminal Justice: Two Problems and a Response, 22 Rutgers L.J. 863, 871-872 (1991).

States have taken four different approaches to this problem: (1) a mechanical approach determined by the law of the forum State; (2) a significant relationship approach that looks to which State has the greater interest in the process by which the evidence was obtained; (3) a governmental interest approach that weighs the interests of the forum State against those of the State where the evidence was obtained; and (4) an exclusionary rule approach based on the underlying policies of the respective exclusionary rules of the States involved. See 1 W.R. LaFave, Search and Seizure § 1.5(c), at 175-186 (4th ed. 2004). Because the problem is broader than searches and seizures under the Fourth Amendment to the United States Constitution and parallel State constitutional provisions, e.g., obtaining privileged information in one State for use in another, some States have applied more than one approach, depending on the type of evidence and the circumstances. Cf., e.g., *State v. Schmidt*, 712 N.W.2d 530 (Minn. 2006) (applying significant relationship approach to question of admissibility of driving while impaired convictions in South Dakota for purposes of enhanced punishment in Minnesota, where South Dakota did not provide right to counsel before making decision to refuse chemical test for blood alcohol, but Minnesota did); *State v. Heaney*, 689 N.W.2d 168, 176-177 (Minn. 2004) (applying significant relationship approach to question of admissibility of blood alcohol evidence lawfully obtained and unprivileged in Wisconsin, but privileged in Minnesota); *State v. Lucas*, 372 N.W.2d 731, 736-737 (Minn. 1985) (applying exclusionary rule approach to question of admissibility of telephone conversation tape-recorded in

we do not reach the conflict of law question. See *Commonwealth v. Ghee*, 414 Mass. 313, 315 (1993) (conflict of laws question not reached because art. 14 satisfied); *Commonwealth v. Jackmon*, 63 Mass. App. Ct. 47, 52 (2005) (same).

Maryland follows Fourth Amendment analysis in questions involving search and seizure. See *Potts v. State*, 300 Md. 567, 575-576 (1984). Although Massachusetts affords more protection than the Fourth Amendment in some respects, those differences do not come into play with respect to the issue of probable cause in this case. Specifically, Massachusetts has retained the two-pronged reliability-basis of knowledge *Aguilar-Spinelli* test, see *Commonwealth v. Upton*, *supra* at 373-374, citing *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), but because there is no unnamed informant here, that test does not apply. The only question here is probable cause. On that point art. 14 and the Fourth Amendment intersect. See *Commonwealth v. Byfield*, 413 Mass. 426, 428 n.4 (1992), quoting *Commonwealth v. Upton*, *supra* at 370 ("We have equated the word 'cause' in art. 14 with the words 'probable cause' "). Here, the application for the search warrant meets the probable cause requirements of both the Fourth Amend-

Wisconsin without warrant, rendering it thereby inadmissible in Wisconsin but *not unlawful* because of consent by one party, and otherwise not unlawful in Minnesota).

In the area of searches, the trend is toward the exclusionary rule approach, based on the validity of the warrant in the State where it was issued, but not exclusively. See *McClellan v. State*, 359 So. 2d 869, 873 (Fla. Dist. Ct. App. 1978) (sister State rule controls); *State v. Bridges*, 83 Haw. 187, 194-195 (1996) (same); *State v. Lucas*, *supra*; *State v. Mollica*, 114 N.J. 329, 352-357 (1989) (same); *State v. Cauley*, 863 S.W.2d 411, 415-416 (Tenn. 1993) (sister State rule controls). Contrast *State v. Davis*, 313 Or. 246, 251-254 (1992) (Oregon Constitution controls); *State v. Briggs*, 756 A.2d 731, 738-739 (R.I. 2000) (governmental interest approach). See also Morrison, Choice of Law for Unlawful Searches, 41 Okla. L. Rev. 579 (1988).

Some States that hold that the sister State rule governing the validity of search warrants determines whether the evidence is admissible in the forum State provide an exception for searches conducted as a cooperative effort between police of the two States: the law of the forum State may control depending on the nature of the agency relationship and the motives of the police of the forum State. See *State v. Bridges*, *supra* at 202 (police consciously set out to evade law of forum); *State v. Mollica*, *supra* at 354-355 (motives of police relevant); *State v. Cauley*, *supra*.

The law in this area is by no means clear or settled.

ment and art. 14, so we need not decide the conflict of law question as to that point.

Probable cause requires evidence that establishes a "substantial basis," *Commonwealth* v. *Upton, supra,* to believe "that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." *Commonwealth* v. *Cinelli,* 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). Applications for search warrants should be read with a practical, nontechnical conception of probable cause, that is, in a commonsense fashion. *Commonwealth* v. *Upton, supra* at 376.

The application for the warrant indicated that the victim had been seen alive, though asleep, at midnight, approximately fifteen hours before the defendant's arrest. The Maryland judge could have concluded that the perpetrator went upstairs after killing the victim, leaving a trail of blood, to get the grandmother's car keys, whose precise location was known to him. The judge could have concluded that this person was the defendant, and that he stole his mother's car at about 2 A.M. to flee the scene of the crime. He also could have concluded that the defendant was in a hurry to flee Massachusetts and did not take the time to change his clothes. Consequently, the blood on his pants when he was stopped in Maryland thirteen to fourteen hours later belonged to the victim. The judge also could have determined that the defendant probably sexually assaulted the victim, as she was found "partially clothed" or "naked"; and the judge could have further concluded that, in his rush to leave, the defendant did not take time to bathe, so he probably would have trace evidence, including blood and other bodily fluids and pubic hair from the victim's body, on and around his genital area. In addition, because of the apparent sexual nature of the assault and the victim's lack of clothing, the judge reasonably could determine that the defendant probably left some of his saliva on the victim's body, such that a buccal swab of the defendant would likely produce evidence that would significantly aid in the investigation.

The defendant's claim that because he had no visible injuries, and absent any evidence of a struggle, a buccal swab would not produce any relevant evidence for purposes of comparison, misses the mark. While he may not have left his blood at the

scene, in this apparent sexual assault he probably left some other body fluid, such as saliva or semen, that warranted the buccal swab.

We conclude that a commonsense, practical reading of the warrant application establishes probable cause to justify taking a buccal swab, a swabbing of his penis, and a combing of his pubic hair.

b. *Adversary hearing.* The defendant next argues that the failure of the Maryland judge to hold an adversary hearing for which the defendant must be given notice and an opportunity to be heard on the taking of the buccal swab violates Massachusetts law, and the evidence seized would have been suppressed if the issue had been raised by trial counsel. See *Matter of Lavigne,* 418 Mass. 831, 835-836 (1994).

At such a hearing the judge "must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other." *Id.* at 836, quoting *Matter of an Investigation into the Death of Abe A.,* 56 N.Y.2d 288, 291 (1982). Such a hearing need not extend beyond affidavits and documentary evidence. *Commonwealth* v. *Maxwell,* 441 Mass. 773, 779 (2004). Written findings are preferred, but their absence "is not fatal where the record plainly supports the conclusion that any weighing of these factors would tilt heavily in favor of granting the Commonwealth's [application for the search warrant]." *Id.* at 779 n.13. See *Commonwealth* v. *Williams,* 439 Mass. 678, 685-686 (2003). The defendant does not suggest that any of these procedures are required under Maryland law.

Here, the record reflects that the warrant application plainly satisfies Massachusetts evidentiary requirements. Murder and rape are serious crimes. DNA evidence that definitively identifies the victim's blood or other bodily fluids on the defendant's person, or his saliva on the victim's body in areas suggesting sexual activity, is of great importance to the investigation. Finally, the intrusiveness of a buccal swab is minimal. See *Commonwealth* v. *Maxwell; Commonwealth* v. *Williams, supra.*[2] Although there

---

[2]We add that, as to the genital swab and the combing of pubic hair, there

was no adversary hearing, the defendant has offered no argument that might have been made on his behalf at such a hearing, other than a contest of probable cause. If the Commonwealth had waited to apply for a warrant to obtain a buccal swab from the defendant, an adversary hearing would have been held, and based on the information in this application, a search warrant probably would have issued. The defendant has failed to show that the absence of an adversary hearing created a substantial likelihood of a miscarriage of justice.

3. *Expert testimony.* Amy Barber gave opinion testimony that the DNA on certain evidentiary exhibits she analyzed was or was not that of the defendant, or that of the victim. She based her opinions, in part, on DNA profiles of the defendant and the victim that were prepared by a different chemist. Barber did not give details about those profiles. She opined that the DNA profile in the samples she analyzed was a "match," or in some cases "not a match," with the defendant's profile. She did the same with regard to DNA profiles in certain exhibits as being a "match" or "not a match" with the victim's DNA profile. Barber did not give any details about the work done by the other chemist to develop DNA profiles of the defendant and the victim.

The essence of the defendant's argument is that an expert who gives an opinion based on hearsay statements inherently violates a defendant's right under the Sixth Amendment to the United States Constitution to confront and cross-examine a witness if the witness whose hearsay statements are relied on by the expert does not testify, even if the hearsay statements are not admitted in evidence. His reliance on *Crawford* v. *Washington*, 541 U.S. 36 (2004), however, is misplaced. In that case the Supreme Court declared that the *admission* of testimonial hearsay in evidence violated the confrontation clause of the Sixth Amendment. *Id.* at 40. Here, the DNA profiles prepared by the nontestifying chemist were undoubtedly testimonial hearsay, but

was some urgency, and the defendant was not entitled to an adversary hearing on these points, as they did not involve penetration into his body. Cf. *Matter of Lavigne*, 418 Mass. 831, 835 (1994). Moreover, he had been lawfully arrested (there was probable cause to arrest him for murder) and any delay could have resulted in a destruction of the evidence. Under Massachusetts law, this was a valid warrantless search incident to an arrest. G. L. c. 276, § 1, second par. Here, the defendant benefited from the additional protection of a warrant.

the profiles themselves were not admitted in evidence and the witness did not testify to their contents.[3]

Opinion testimony, though based on hearsay, is admissible and does not offend the Sixth Amendment so long as the witness does not testify to the details of the hearsay on direct examination. Thus, the witness giving the opinion testifies at trial only about her own action and observations, the identification of the hearsay material on which she relies, the reliance by professionals within her area of expertise on such hearsay, and her own opinion. She is subject to cross-examination about those matters. If the cross-examiner chooses to delve into the hearsay basis of the opinion, he is free to do so.

We have held that an expert witness may testify in this fashion, provided that the hearsay is independently admissible, that it is the kind of evidence experts customarily rely on as a basis for opinion testimony, and that the expert does not testify to the details of any hearsay on direct examination. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986). We also have upheld this rule in the context of the requirement of the Sixth Amendment set forth in *Crawford* v. *Washington, supra.* See *Commonwealth* v. *Nardi*, 452 Mass. 379, 390 (2008). See also *Commonwealth* v. *Avila*, 454 Mass. 744, 761-762 (2009); *Commonwealth* v. *Hensley*, 454 Mass. 721, 732 (2009).

Any error in the form of Barber's opinion, i.e., her use of the word "match," was waived by a failure to object. Had there been an objection, she easily could have reformulated her testimony to fall within the rule of *Department of Youth Servs.* v.

---

[3]Although the defendant does not argue that the "match" testimony about profiles was *factual* (as opposed to opinion), we consider this argument pursuant to our responsibilities under G. L. c. 278, § 33E. Barber's testimony that the DNA profiles she developed were a "match" to those developed by the nontestifying chemist constitutes testimonial hearsay as to those developed by the nontestifying chemist. That is a violation of the defendant's right under the Sixth Amendment to the United States Constitution to confront that chemist. See *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004). However, the issue was not preserved, and in view of Barber's proper testimony that the probability of the DNA on the fingernail sample being that of some person other than the defendant was one in 5 quadrillion, and one in 410 trillion for the saliva sample, without any need to testify about a "match," there is no substantial likelihood of a miscarriage of justice. Even if the issue were properly preserved, it would be harmless beyond a reasonable doubt. *Commonwealth* v. *Vasquez*, 456 Mass. 350, 360-361 (2010).

*A Juvenile, supra.* For example, Barber could have testified that, based on her training and experience, her development of a DNA profile on a particular exhibit, and her review of the DNA profile of the defendant developed by the nontestifying expert, the probability that the DNA in question belonged to someone other than the defendant was one in "X." In light of the proper formulation of the statistical component of her opinion, which indicated that the probability of the DNA in question being that of someone other than the defendant was on the order of one in 5 quadrillion, or one in 410 trillion, depending on the particular swab, any error in referring to the DNA evidence as amounting to a "match" did not create a substantial likelihood of a miscarriage of justice.

4. *Prior criminal convictions.* The defendant argues that the judge impermissibly allowed the prosecutor to exploit evidence of prior convictions and use them to show propensity. The defendant offered evidence of his prior convictions during his own testimony to establish his motive for fleeing the scene of the homicide. The defendant testified that he left the home and walked to a bar about fifteen minutes away, where he drank about six beers until closing time, about 2 A.M. When he returned home he discovered the victim's dead body and panicked because he thought, based on his criminal record, he would be the prime suspect. He fled.

The defendant did not offer his criminal convictions as anticipatory impeachment to take some of the sting out of the prosecutor's likely impeachment pursuant to G. L. c. 233, § 21. See *Commonwealth* v. *Coviello*, 378 Mass. 530, 533 (1979). Rather, he offered evidence of his prior convictions for substantive purposes, and thereby put them in evidence for all purposes. Nevertheless, the prosecutor did not exploit them, either in his cross-examination of the defendant or in his closing. He used the convictions forcefully, precisely, and properly to demonstrate that the defendant was not worthy of belief. *Commonwealth* v. *Drumgold*, 423 Mass. 230, 249 (1996).

The prosecutor's use of the defendant's theft of his mother's car to flee the Commonwealth to avoid prosecution, in combination with his record of convictions, to argue that he was not to be considered credible, was a fair juxtaposition and argument. There was no error.

5. *Review under G. L. c. 278, § 33E.* We have reviewed the briefs, the transcripts, the entire record, and the exhibits, and we conclude there is no reason to reduce the degree of guilt as to the murder conviction or order a new trial.

*Judgments affirmed.*