Billings, Thomas P., J.
The defendant is charged with trafficking in oxycodone, possession of a Class E substance (alprazolam) with intent to distribute, and two counts of conspiracy to violate Chapter 94C. The case began with an investigation into an oxycodone distribution enterprise in Billerica. Delivery, money transfer and telephone records, interviews in Billerica, and fingerprint evidence pointed to a Florida wholesale source; specifically, the defendant Destephan.
Using information supplied by the Billerica police, a Florida DEA agent applied for and obtained a federal warrant to search Destephan’s Miami residence. The warrant issued on August 18, 2009 and was executed the same day. A Billerica detective was on the search team, which also included members of the Miami-Dade police department. The defendant now seeks to suppress the fruits of (a) the warranted search of his residence, (b) a statement he gave at the scene, and (c) a further search which exceeded the parameters of the warrant but to which the defendant ostensibly consented. I held an evidentiary hearing and heard argument on April 26, 2011.
For the following reasons, Defendant’s Motion to Suppress Statements and Defendant’s Motion to Suppress Evidence are both ALLOWED in their entirety.
I. THRESHOLD ISSUE: COLLATERAL ESTOPPEL
At the outset, the Commonwealth argues that Destephan is collaterally estopped from moving to suppress the evidence in this case by virtue of a Florida criminal proceeding involving contraband that was seized in the same search as is challenged here, but does not form the basis of any of the Massachusetts charges. That search yielded a quantity of Oxycontin pills, for which Destephan was arrested. He was arraigned on September 17, 2009 in the Miami-Dade circuit criminal court.[1] No motion to suppress was *398 ever filed or litigated, however; instead, on February 2, 2010, Destephan entered into a plea agreement, tendered his plea of guilty, and was sentenced to three years’ probation and $633.00 in fines and court costs.
Seven months later, on September 9, 2010, a Massachusetts grand juiy indicted Destephan in this case. On September 23 the indictment was returned in court, and Destephan was defaulted. On October 14, he brought a motion in the Miami-Dade court for permission to travel, which was allowed the next day. He appeared and was arraigned in this Court on October 25. Bail was set at $20,000, which Destephan has not posted. Back in Miami, his attorney filed a motion to terminate his probation, which the court there allowed on January 14, 2011.
Before me, Destephan’s counsel (a member of the Florida bar, who also represented Destephan in the Miami-Dade case) recalled that the Florida disposition was a “withholdive adjudication” based on a “best interests plea of no contest.”[2] This may well be so, though the docket provides no insight on the question and I do not have a transcript of the plea hearing. In any event, it makes no difference to the collateral estoppel issue whether or not the defendant admitted guilt in connection with his plea.
In Commonwealth v. Cabrera, 449 Mass. 825 (2007), the SJC discussed the application of collateral estoppel, a doctrine which “has its roots in civil proceedings,” to criminal cases.
Collateral estoppel guarantees that “when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.”
Five requirements must be met for collateral estop-pel to apply in the context of a suppression motion: (1) the issues in the two proceedings must be identical; (2) the party estopped must have had sufficient incentive to litigate the issue fully and vigorously; (3) the party estopped must have been a party to the previous litigation; (4) the applicable law must be identical in both proceedings; and (5) the first proceeding must have resulted in a final judgment on the merits such that the defendant had sufficient incentive and an opportunity to appeal.
449 Mass. at 829 (citations and footnote omitted). Put more succinctly,
collateral estoppel requires the concurrence of three circumstances: (1) a common factual issue; (2) a prior determination of that issue in litigation between the same parties; and (3) a showing that the determination was in favor of the party seeking to raise the estoppel bar. The burden of showing these circumstances is always on the person raising the bar.
Commonwealth v. Lopez, 383 Mass. 497, 499 (1981).
The most fundamental flaw in the Commonwealth’s collateral estoppel argument is that unlike Cabrera[3] and every other case where collateral estoppel applies, the factual issues sought to be precluded in this action—the constitutionality of the searches and the statement in Miami—were never litigated or decided in the Florida criminal case. See Commonwealth v. Rodriguez, 443 Mass. 707, 709-10 (2005) (collateral estoppel, also called issue preclusion applies “[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment . . .”; citation omitted).[4]
A second, and logically related, defect is that Destephan, having been offered probation in Florida pursuant to a plea agreement that relieved him from a three-year mandatory sentence, see note 1, supra— and not yet having been charged in Massachusetts— had little incentive to litigate the suppression issues; in fact, he never even brought a motion. Finally, as discussed in the section immediately below, the law applicable in this proceeding is not the same as would have been applied had the suppression issues been litigated in a Florida court, where the “good faith” exception to the exclusionary rule might have salvaged the fruits of an unconstitutional search. For all of these reasons, Destephan remains free to litigate the admissibility of the fruits of the searches, as well as his statement, in this proceeding.
II. VALIDITY OF THE SEARCH WARRANT
The warrant in question issued on August 28, 2009 out of the United States District Court for the Southern District of Florida. The application was supported by the affidavit of Special Agent David Huang of the Drug Enforcement Agency’s Fort Lauderdale office, and recites that the information therein was developed in a joint investigation by the DEA, the FBI, and the Billerica Police Department into an oxycodone and Xanax trafficking operation in Billerica. The principals of the operation were Kevin Cormier and Mark Doherty. Because the chief challenge to the warrant is that the information was stale, I here summarize the chronology given in Agent Huang’s affidavit, which began with the observation that the averments therein were “based on a joint investigation by the Billerica (Massachusetts) Police Department, the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (“ATF”), and the DEA.”
October 2008
Billerica investigation begins.
November 12, 2008
Undercover buy of two oxycontin pills from Kevin Cormier and Mark Doherty, in Billerica; both Cormier and Doheriy arrested.
January 2009
Confidential informant tells ATF and Billerica police that between September and December 2008, he sold five New Hampshire-purchased handguns to Doherty in barter transactions for *399 oxycontin pills. The Cl’s purchases are confirmed in gun shop records. From a photo array, Cl identifies Doherty and also Mark Cincotta, another dealer from whom he has purchased oxycontin on 10-15 occasions. Unnamed sources report that Doherty is purchasing large quantities of oxycontin from a Florida source.
Januaiy 6, 2009
Cl makes a controlled purchase of two oxy-contin pills from Doherty.
Januaiy 23, 2009
With a warrant, police search Doherty’s Lowell, Massachusetts residence. The search yields five Xanax pills and no oxycontin, but in a safe the police find seven wire transfer receipts showing transfers by Doherty and William Regan to defendant Destephan (at 677 N.E. 87th Street, Miami) and Regan himself. The transfers were to Miami, totaled $19,839, and occurred between November 2 and December 28, 2008.
A ledger records the transfers and has abbreviations suggestive of quantities and types of drugs. Doherty, Regan and Cincotta are present for the search.
The police look in Cincotta’s wallet for identification, and find (to Cincotta’s avowed puzzlement) a note with a Federal Express tracking number and a phone number. Police determine that the package originated in Miami and will arrive at Cincotta’s home the next day.
Januaiy 24, 2009
Police intercept the Cincotta package, get a warrant, open it, and find 100 oxycodone pills and 100 Xanax pills.
From FedEx and UPS records, police determine that between September 23, 2008 and Januaiy 23, 2009, Doherty, Regan and Cincotta have received at least twenty packages from largely fictitious Miami addresses, on dates corresponding closely with those of the wire transfers, from senders with names (Stevens, Estephan, Stefano) that they suspect may be aliases for Destephan.
From phone records, police learn of 1,295 calls between Regan and Destephan and 111 calls between Doherty and Destephan between September 2008 and January 2009, often clustered around the dates of the wire transfers. Also, Cincotta called Destephan numerous times on Januaiy 24, 2009.
February 12, 2009
Police interview Regan, who admits to being the middleman between Doherty and Destephan, with whom he stayed in Florida for a few weeks after moving there in the fall of2008. Regan states that Destephan has “recently been evicted” from his home on N.W. 44th Avenue, Miami, where Regan stayed.
July 2, 2009
Police execute a search warrant at a Billerica residence where Doherty is now residing. Among the items recovered is a FedEx receipt for a package sent from a fictitious Miami address to Doherty. The affidavit does not give the date the package was sent, but notes that it was determined on June 24, 2009 to bear at least one of Destephan’s fingerprints.
August 8, 2009
Agent Huang learns that Destephan has moved from 677 N.E. 87th Street, Miami (the recipient’s address on the wire transfers) to 5921 S.W. 62nd Street in South Miami. A visit to the property finds Destephan’s car in the driveway.
The application sought, and the warrant granted, permission to search the 5921 S.W. 62nd Street residence for: controlled substances; cash; records of drug sales, sources and Destephan’s travel; documents related to his aliases; computer hardware, software, documentation, and storage devices; records of interstate communications; financial records; documentation of occupancy; and cell phones and other mobile communications devices. The warrant issued on August 18, 2009. It was executed that evening by a search team consisting of Agent Huang, another DEA agent, members of the Miami-Dade and Sunrise police departments, and Detective Roy Frost of the Billerica Police.
A. Choice of Law.
As is clear from the search warrant affidavit, the search of Destephan’s residence was an accommodation by federal and Florida law enforcement to the Billerica police or, at the very least, a joint endeavor among Massachusetts, Florida and federal authorities. If the federal search had taken place in Massachusetts in aid of a joint federal-state operation or one initiated or requested by Massachusetts law enforcement, the suppression issue would undeniably be governed by Massachusetts law. “In such a combined operation, if . . . State [law] imposes a stricter standard, it is by that standard that the validity of official conduct is to be judged for purposes of a motion to suppress.” Commonwealth v. Jarabek, 384 Mass. 293, 297 (1981) (discussing the issue in the context of federal and state wiretap statutes); see Commonwealth v. Gonzalez, 426 Mass. 313, 315-17 (1997) (wiretap); Commonwealth v. Pinto, 45 Mass.App.Ct. 790, 792 (1998) (constitutionality of warrantless dog sniff at postal facility); Commonwealth v. DiPietro, 35 Mass.App.Ct. 638, 641 n.4 (1993) (noting but not deciding the issue in context of Aguilar-Spinelli v. Upton standards in judging warrant application).
The SJC recently suggested that a similar analysis may apply where the search takes place out of state. In Commonwealth v. Banville, 457 Mass. 530 (2010), while observing that “[t]he law in this area is by no means clear or settled” and that “the trend is toward” *400 applying the exclusionaiy rule “based on the validity of the warrant in the State where it was issued,”[5] the court also noted caselaw that carves out “an exception for searches conducted as a cooperative effort between police of the two States: the law of the forum State may control depending on the nature of the agency relationship and the motives of the police of the forum State.” Id. at 536-37 n.1.
In Banuille, the issue was whether evidence seized pursuant to a search warrant issued and executed in Maryland was properly admitted in a Massachusetts trial. The SJC ruled in the affirmative.
The broad question here is whether evidence seized pursuant to a validly issued search warrant in Maryland is admissible in a criminal trial in Massachusetts if the search warrant would not have been valid if issued in Massachusetts. Of course, if there was no probable cause under Fourth Amendment standards to issue the warrant in Maryland, the evidence is not admissible anywhere. If the warrant validly issued in Maryland but would not have been valid if issued in Massachusetts, then we must address the conflict of law question to determine its admissibility in Massachusetts. If the warrant would have been valid in Massachusetts, the evidence is admissible in Massachusetts and we do not reach the conflict of law question.
Maryland follows Fourth Amendment analysis in questions involving search and seizure. Although Massachusetts affords more protection than the Fourth Amendment in some respects, those differences do not come into play with respect to the issue of probable cause in this case .. . The only question here is probable cause. On that point art. 14 and the Fourth Amendment intersect. Here, the application for the search warrant meets the probable cause requirements of both the Fourth Amendment and art. 14, so we need not decide the conflict of law question as to that point.
457 Mass. at 536-37 (citations omitted).
Unnecessary to the decision in Banville, and therefore omitted from it, was any discussion of the so-called “good faith” exception to the exclusionaiy rule in Fourth Amendment jurisprudence.
In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.
United States v. Leon, 468 U.S. 897, 926, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984). “Massachusetts has never adopted the ‘good faith’ exception,”[6] Commonwealth v. Valerio, 449 Mass. 562, 569 (2007), but Florida has embraced it. State v. Campbell, 948 So.2d 725, 726 (Fla. 2007).[7]
As discussed further below, the warrant application in this case did not provide probable cause to search Destephan’s residence in August 2010. I assume for argument’s sake, however, that the good faith exception might be brought to bear, in a jurisdiction that recognized it.[8] I hold, however—while acknowledging that the appellate caselaw does not provide ciystal-clear direction on the issue—that where the warrant issued in service of a Massachusetts investigation, based on information developed in that investigation and provided to federal agents by a Massachusetts police department, the Massachusetts exclusionary rule—sans good faith exception—applies, even though the warrant was issued by a federal magistrate and executed outside Massachusetts.
The exclusionary rule serves the twin purposes of deterring unlawful conduct by law enforcement officials, and “the protection of judicial integrity through the dissociation of the courts from unlawful conduct.” Commonwealth v. Brown, 456 Mass. 708, 715 (2010); see Terry v. Ohio, 392 U.S. 1, 21-22 (1968). The “good faith” exception undermines both. A warrant issued without probable cause—an objective standard—is an unconstitutional warrant. The ensuing search is an unconstitutional search. Post hoc ascertainment of the purity of the human heart is an imprecise exercise, at best. The Leon court’s reasoning to the contrary notwithstanding, the rule announced in that case seems destined to encourage governmental authority to push the constitutional envelope, thus eroding significantly the Fourth Amendment’s solemn assurance that “no Warrants shall issue but upon probable cause . . .”[9]
Usually, when the search occurs outside our borders, this is none of a Massachusetts court’s business. In a case in which Massachusetts law enforcement participated in procuring and executing the defective warrant, in aid of a Massachusetts investigation and a prosecution in a Massachusetts Court,[10] however, the search should be judged by Massachusetts constitutional standards, and I do so here.
B. Staleness
“Facts supporting probable cause must be ‘closely related to the time of issue of the warrant [so] as to justify a finding of probable cause at that time.’ Timeliness of the facts must be ‘determined by the circumstances of each case.’ ” J. Grasso & C. McEvoy, Suppression Matters Under Massachusetts Law, §8.2[b] at p. 8-5, quoting Sgro v. United States, 287 U.S. 206, 210-11 (1932).
In this case, the affidavit provided probable cause to believe that between September 2008 and January 2009, Destephan supplied significant quantities of prescription narcotics to the Billerica ring, for which he was paid significant amounts of money, and that at the time, he was living at 677 N.E. 87th Street, Miami (though he endeavored to conceal his address where possible). The affidavit detailed law enforcement’s continued efforts to collect and process *401 information at the Billerica end. Its recitation of Doherty’s, Regan’s and Cincotta’s commercial activities and their dealings and communications with Destephan comes to an abrupt halt, however, at January 24, 2009, the day after the search of Doherty’s apartment, and nearly seven months before the warrant to search Destephan’s Florida residence issued.*[11]
Timeliness concerns are thought to be especially acute in cases where narcotics are sought, “for it is well settled that narcotics are readily consumed or distributed so that probable cause to search for them rapidly dwindles.” Commonwealth v. Rice, 47 Mass.App.Ct. 586, 590 (1999). “On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance.” Commonwealth v. Vynorius, 369 Mass. 17, 25 (1975), quoting Bastida v. Henderson, 487 F.2d 860, 864 (5th Cir. 1973).
Still, “(t]here must be a natural limit to the gap in time between the latest information and a warrant’s issuance that may fairly be bridged by evidence of prior continuous criminal activity.” Rice, 47 Mass.App.Ct. at 591. In Rice, the Appeals Court held that “the six weeks at issue here does not exceed that limit,” while noting that it had found no reported Massachusetts case going so far. Nor have I found any such Massachusetts case, decided before Rice or in the twelve years since.
Cases from the federal courts, however, have applied the principle to permit searches occurring months after the last sale or other observation. See, e.g., United States v. Leasure, 319 F.3d 1092, 1099 (9th Cir. 2003) (over six months); United States v. Smith, 266 F.3d 902, 904-05 (8th Cir. 2001) (four months); United States v. Iiland, 254 F.3d 1264, 1269 (10th Cir. 2001) (four months); United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999) (three months); United States v. Myers, 106 F.3d 936, 939 (10th Cir. 1997) (five months); United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991) (twoyears); see State v. Grimshaw, 128 N.H. 431, 515 A.2d 1201 (1986) (seven months). Under these cases—and remembering that “(t]he determination of timeliness . . . does not depend on simply the number of days that have elapsed between the facts relied on and the issuance of the warrant,” but rather “on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized,” Iiland at 1268-69 (citation omitted)—the seven-month hiatus in this case was not, per se, out of bounds.
It was, however, excessive for other reasons. The affidavit gave every reason to believe that on January 23 or, at the latest, January 24, 2009, Destephan learned that the Billerica oxycodone ring had been rolled up; at least, it’s hard to imagine what else he and Cincotta would have found to talk about in their January 24 phone conversation. He also likely was aware, as a matter of general knowledge, of federal interest and federal-state cooperation in interstate narcotics enforcement. To the extent that the search was for records and other evidence of his sales to Doherty, Regan, and Cincotta, Destephan (who seems not to have extended credit) no longer had a business reason to retain them, and he had every reason to destroy them—or at least, to move them out of his home, assuming they had been there in the first place. The information in the affidavit, in other words, was stale.
C. “Nexus”
There is also the rule that “(a]n affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activiiy under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.” Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983).
In Massachusetts’ application of this principle— known as the “nexus” rule—"probable cause to expect that drugs will be present in a home is not established by the fact that the defendant lives there." Commonwealth v. Pina, 453 Mass. 438, 431 (2009). In other state and federal courts, however, “(i]t is commonly held that this gap can be filled merely on the basis of the affiant-officer’s experience that drug dealers ordinarily keep their supply, records and monetary profits athome.” 2 W. LaFave, supra, §3.7(d) at 421-22 (2004), and cases cited at n.170. Agent Huang’s affidavit contained the customary recitation, at paragraph 19, that drug traffickers “routinely conceal” such items “at their residences and vehicles.”
Beyond this, however, the affidavit made no connection between the items sought and Destephan’s residence. Nor was it even apparent where that residence was located while he was shipping to Billerica. Regan told the police that he had stayed with Destephan “for a few weeks” in the fall of 2008 at an address on N.W. 44th Street, Miami (no number supplied),[12] from which Destephan had been evicted by February 2009. The records of the wire transfers, on the other hand, gave his address as 677 N.E. 87th Street, which coincided with the records of the Florida Registry of Motor Vehicles. By August, however, he had evidently settled at 5921 S.W. 62nd Street.
The shipping documents did not resolve the issue of where Destephan had been living, because he used fake names and addresses. More to the point, there was no evidence Destephan had ever kept his inventory or records at his residence, whether on 44th Street, 87th Street, 62nd Street, or somewhere else. Nor was there any evidence—not even a rumor, nor a mention in Regan’s statement to the police—that Destephan had ever sold narcotics to anyone outside Billerica, and thus no suggestion whether his business had outlasted the Billerica franchise. Finally (and *402 perhaps most importantly), there is no evidence that Destephan, during the four months that he was known to have shipped pills to Billerica, had any connection with the address (5921 S.W. 62nd Street) that the DEA and police now proposed to search.
In short: this application did not provide probable cause to believe that contraband or other evidence of illegal activity would be located in the place to be searched, at the time the search warrant issued. The defendant’s motion to suppress the physical evidence seized in the search of his residence is therefore allowed.
III. DESTEPHAN’S STATEMENT
Next, Destephan challenges the admissibility of a statement he gave at his home, on the day of the search, to Detective Roy Frost of the Billerica Police Department.
A. Findings of Fact
Based on the credible evidence, and applying the appropriate burden of proof,[13] I find the following facts.
1. On August 18, 2009, a federal warrant issued, without probable case (see above), to search Destephan’s home at 5921 S.W. 62nd Street, South Miami, Florida.
2. Shortly before 9:00 p.m. that evening, a search team consisting of two DEA agents, officers of the Miami-Dade police, a Sunrise police officer, and Detective Frost, executed the warrant and searched the defendant’s residence.
3. Destephan was at home. He was presented with the search warrant and handcuffed in front, apparently as a precautionary measure; he was not yet under arrest.
4. About ten minutes into the search Det. Frost, accompanied by DEA Agents Huang and McQuinlan, sat with Destephan while the others continued searching. It is clear from the recording that he was in custody; i.e., was not free to leave.
5. Agent Huang, using a DEA form, gave Destephan a constitutionally sufficient Miranda warning (albeit without the recommended “fifth warning”),[14]'* having Destephan acknowledge each portion by initialing the form which he then signed at the bottom. By signing and also orally, Destephan indicated his willingness to speak with the police.
6. The police then began questioning Destephan. It was now about 9:00 p.m. (The warrant issued at 5:50 p.m., and authorized execution between 6:00 a.m. and 10:00 p.m.) Destephan was in custody at the time, as the police reminded him at least once during the interview.
7. Very early on,[15] Frost obtained Destephan’s consent to record the interview, and switched on a recording device.
8. In 25 minutes of recorded conversation, Destephan engages in an increasingly chimerical effort to exculpate himself by blaming his former roommate Regan,[16] and trying to attribute each item of evidence against him as Frost mentioned it—his fingerprints on a package, the wire transfers, the appearance of his former employer (T&C Painting) on the return address for the Cincotta package, etc.—to Regan’s perfidious character and intimate knowledge of his affairs. He makes no direct admissions of criminality.
9. Destephan did not appear to be—and I find that he was not—intoxicated, mentally ill, of tender years, naive, or of low intelligence. No improper threats, promises, minimization, trickeiy, or other questionable techniques were employed (beyond the officers’ statements that they were “here to help” Destephan, which assurances the latter clearly assigned no more weight than they deserved). Apart from the illegality of the search and Destephan’s accompanying detention, I find beyond a reasonable doubt that his statement was given voluntarily.[17]
10. Other than from a brief discussion in which Destephan said he took oxycodone by prescription for back pain following an old motor vehicle accident, there was no apparent reference to any evidence seized in the search of Destephan’s residence; the questioning was focused on the evidence already developed that he had shipped narcotics to Billerica. But for the unlawful search, however, the police would not have been in Destephan’s house; they would not have discovered the oxycodone pills; and Destephan would not have been in custody; and he probably would not be talking with police officers or DEA agents.
11. Destephan’s statement was the “but-for” result of the illegal search, minutes before, in his residence, in which the questioning took place. Although the conversation was mostly about matters other than the evidence found, the Commonwealth has not demonstrated that the taint of the illegal search had dissipated by the time of the statement.
B. Conclusions of Law
There is no basis for suppressing the statement on Miranda or traditional voluntariness grounds. There remains, however, the issue of whether the statement was the suppressable fruit of unlawful police conduct. Based on the findings of fact recited above and applicable law, I conclude that it was.
Evidence obtained as a result of an illegal search, seizure, and/or arrest is to be suppressed unless the connection between the police misconduct and the evidence has “become so attenuated as to dissipate the taint.” Nardone v. United States, 308 U.S. 338, 341 (1939). The issue
in such a case is “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by *403 exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.”
Wong Sun v. United States, 371 U.S. 471, 488 (1963) (citation omitted).
Not every statement made following an illegal arrest—not even every statement that is the “but-for” result of an illegal arrest—need be suppressed. On the other hand, the mere fact that the statement was preceded by Miranda warnings and meets the volun-tariness standard of the Fifth Amendment does not necessarily salvage it, where the defendant is in custody as the result of a Fourth Amendment violation.
The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximily of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.
Brown v. Illinois, 422 U.S. 590, 603-04 (1975).[18] Accord, Commonwealth v. Damiano, 444 Mass. 444, 455 (2005); Commonwealth v. Pietrass, 392 Mass. 892, 902-03 (1984). As the Brown decision makes clear, these factors supply guidance for resolution of what is still, with statements as with other kinds of evidence, the overarching issue: whether the evidence was obtained “by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Wong Sun, 371 U.S. at 488.
Here, the defendant’s interrogation took place soon after the search of his home had begun, while he and his interrogators were still in the home. He was in custody, under the apparent authority of an invalid search warrant. Although the actual fruits of the search do not appear to have been exploited in the interrogation—indeed, it is not clear that anything had yet been discovered—the Commonwealth has not shown that the defendant would have given the interview except in response to a show of authority—the search warrant, with the handcuffs helping to reinforce the point—by law enforcement. The statement was thus a direct, unattenuated product of the warrant, and will be suppressed.
IV. THE SEARCH OF THE SAFETY DEPOSIT BOX
Finally, Destephan challenges the expansion of the search of his residence, to include a safety deposit box not mentioned in the warrant.
A. Findings of Fact
I find the following additional facts by a preponderance of the evidence. [19]
12.After interviewing Destephan, Det. Frost asked his consent to search a safety deposit box, a key to which the police had discovered during the search. Destephan said yes.
13. Agent Huang produced a DEA Consent to Search form. Someone completed it to specify a “SAFETY DEPOSIT BOX BELONGING TO DAVID ALAN DESTEPHAN LOCATED AT 5921 SW 62 STREET MIAMI FL 33143.” Destephan signed. Someone added to the description the fact that it was “BOX # 000937051032" and requested that Destephan initial the change, which he did.
14. All of this occurred while Destephan and the search team were still at Destephan’s residence. Neither the consent form nor the testimony supplies a time, but I infer that Destephan’s consent was obtained while the search was underway or within a few minutes after it was finished.
15. As I have found in connection with his statement, Destephan was not intoxicated, mentally ill, of tender years, naive, or of low intelligence, and the search team used no improper threats or promises to obtain his consent. The discovery of the key and of the box’s existence, however, was a direct fruit of the unlawful search, and Destephan’s consent was solicited and given at the location, and within minutes, of that search.
B. Conclusions of Law
If “consent obtained during an illegal detention is ineffective to justify an otherwise invalid search,” Commonwealth v. Torres, 424 Mass. 153, 158 (1997), it follows that the Commonwealth may not rely on consent to search obtained from the defendant while he was detained in connection with a prior, unlawful search. Moreover, the existence of, and key to, the safety deposit box were discovered in the course of the unlawful search. Very little time and no intervening events or circumstances distanced that search from the consent. Whether analyzed as-the fruit of the poisonous tree or, as in Commonwealth v. Midi, 46 Mass.App.Ct. 591, 595-96 (1999), the fruits of the search of the safely deposit box must be suppressed.
ORDER
For the foregoing reasons, Defendant’s Motion to Suppress Evidence and Defendant’s Motion to Suppress Statements are both ALLOWED. All items discovered in the warranted search of the defendant’s residence and in the subsequent search of his residence, as well as the defendant’s statement, are hereby suppressed.

The docket lists the charges as “II DRUGS/TRF/4’/,” and “CONT SUBS/POSS,” both felonies. Florida Statute 893.135(l)(c)l.a makes the possession, manufacture, delivery or importation of various opiates, including oxycodone, in amounts greater than four grams and less than 30 kilograms a felony of the first degree, known as “trafficking in illegal drugs.” There is a staircased sentencing scheme based on quantify. On paper at least, the charge against Destephan— between four and fourteen grams—carried a mandatory minimum sentence of three years. If Florida practice resembles our own, one might assume that the probationary sentence *404 that Destephan actually received under his plea agreement (see text below) involved a charge concession by the State, providing Destephan with a significant incentive not to litigate any suppression issues he might otherwise have pursued.

Pleas of no contest are governed by Florida Rule of Criminal Procedure 3.172, which requires (among other things) that the judge determine that the plea is entered voluntarily and that it has a factual basis. A “best interest” plea under Rule 3.172 is an Alford plea. See Boykin v. Garrison, 658 So.2d 1090, 1090-91 (Fla.App.4th Dist. 1995).

In Cabrera, the defendant was charged in the district court with receiving stolen property found in his automobile in the course of a warrantless stop. He moved to suppress the fruits of the stop. Following an evidentiary hearing, the district court denied the motion, and Cabrera thereafter pleaded guilty. The Commonwealth was subsequently able to develop evidence that Cabrera had actually participated in the store break-in during which the goods were stolen, and indicted him for breaking and entering. The SJC affirmed this Court’s ruling that Cabrera was not entitled to litigate his motion to suppress a second time.

Nhis requirement distinguishes issue preclusion from its first cousin, claim preclusion. Both doctrines are sometimes lumped together under the umbrella term “res judicata,” but they differ in this and other material respects. See generally Kobrin v. Board of Registration in Medicine, 444 Mass. 837, 843-44 (2005).

Accord, Commonwealth v. Jackmon, 63 Mass.App.Ct. 47, 50 n.4 (2005) (“Massachusetts recognizes ‘the generally accepted rule that the validity of an arrest is determined by the law of the State in which the arrest is made.’... Other States recognize a similar rule regarding searches, seizures, and other interceptions; the law of the State in which the search occurs informs the validity of the search”).

Massachusetts’ eschewal of the good faith exception is a product of the greater protections afforded by Article 14 of the Massachusetts Constitution, see Commonwealth v. Treadwell, 402 Mass. 355, 356 n.3 (1988), but extends even to issues in which the state and federal standards for probable case are the same.

The same, incidentally, is true of Maryland, where the search in Banville took place. Patterson v. State, 401 Md. 76, 104-11, 930 A.2d 348 (2007).

This seems far from a sure thing, however, since different federal and state courts have taken markedly divergent views concerning how close the probable cause question must be for the good faith exception to apply. See cases cited and discussed in 1 W.R. LaFave, Search and Seizure § 1.3(f) at 98-99 n.131 (4th ed. 2004).

For a more extended and erudite treatment of this issue, see the discussion in 1 W. LaFave, supra, §1.3.

I hasten to add that I make no finding of bad or good faith on the part of the officers and agents involved in this investigation. I hold only that the admissibility of the evidence seized in the search is to be judged strictly by objective constitutional standards, as if it had been seized in Massachusetts.

The possible exception is the FedEx package which the police fingerprinted on June 24, and whose receipt they found in Doherty’s Billerica residence on July 2, 2009; the affidavit, however, says nothing about a date on the package or the receipt.

The affidavit gives no indication that the police or the DEA ever ascertained where on 44th Street Destephan had been living.

Once the defendant has proved by a preponderance of the evidence that he was in custody, see Commonwealth v. Girouard, 436 Mass. 657, 665 (2002), the Commonwealth must prove beyond a reasonable doubt that the defendant received a proper Miranda warning and that he voluntarily waived his Fifth Amendment privilege. Commonwealth v. O’Brian, 445 Mass. 720, 724 (2006). Custodial or not, the Commonwealth must also prove beyond a reasonable doubt that the statement was voluntary. Id. Where the statement followed an illegal search and an arrest for contraband discovered thereby, the Commonwealth must prove by a preponderance of the evidence that “the nexus between the conduct of the police deemed illegal and the discovery of the challenged evidence is so attenuated as to dissipate the taint.” Commonwealth v. Cote, 386 Mass. 354, 362 (1982).

See Commonwealth v. Lewis, 374 Mass. 203, 205 (1978) (the “better practice” is to advise the suspect that he may terminate the interview at any time, but such is not required under federal or Massachusetts law).

The recording of the statement begins in media res, with no explicit indication of what has gone before or how long Destephan had been speaking to the police. Contextual details suggest, and I find, that the recording began early in the statement, before either side had said anything of much substance to the other.

Destephan said that Regan had resided with him at 126 N.W. 44th Avenue for about two months in October-December 2008, and that he (Destephan) had moved to his present address on January 1, 2009.

This finding is based in part on the testimony of Detective Frost and in part on my review of the recorded statement.

Reasoned the Brown court, “exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.” 422 U.S. at 601.

The Commonwealth again has the burden. See United States v. Matlock, 415 U.S. 164, 177 (1974); Commonwealth v. Berry, 420 Mass. 95, 104 (1995).