*Derrick L. Carroll v. State of Maryland*, No. 510, September Term, 2017.  Opinion by Kenney, J.

**CRIMINAL PROCEDURE – WARRANT REQUIREMENT – PROBABLE CAUSE**

An issuing judge's probable cause determination is reviewed under the *Illinois v. Gates* totality of the circumstances test, looking only to the information provided in the warrant and its accompanying application documents.  Probable cause may be based on information obtained through a state investigation in collaboration with law enforcement from other state or federal jurisdictions.  A finding of probable cause cannot rest on purely conclusory affidavits.

**CRIMINAL PROCEDURE – WARRANT REQUIREMENT – PROBABLE CAUSE – NEXUS**

A probable cause determination requires that a sufficient nexus be shown between the alleged criminal activity, the place to be searched, and the things to be seized.  In this case, the affidavit to the warrant application did not provide any information establishing why appellant was named a suspect in the investigation.  For that reason, it was a purely conclusory determination.

**CRIMINAL PROCEDURE – WARRANT REQUIREMENT – PROBABLE CAUSE – SUBSTANTIAL BASIS**

We review whether the issuing judge had a substantial basis to conclude that the warrant was supported by probable cause, that is, whether there exists a fair probability that contraband or evidence of a crime will be found in the place of the search.  We accord great deference to the issuing judge's determination by reviewing affidavits in a commonsense fashion and viewing the factual recitations in the warrant application in the light most favorable to the state.

**CRIMINAL PROCEDURE – WARRANT REQUIREMENT – GOOD FAITH EXCEPTION – CONFLICT OF LAWS – MARYLAND OR NEW JERSEY LAW**

Because the suppression court found that the officers executed the warrants in good faith reliance, the good faith exception to the warrant requirement is properly before us.  Maryland has adopted the *United States v. Leon* good faith exception that allows evidence obtained under a deficient warrant to be admissible if the executing officers acted in objective good faith in relying on the warrant.  The New Jersey Supreme Court has expressly declined to adopt the *Leon* good faith exception on independent state grounds.  *See State v. Novembrino*, 519 A.2d 820 (N.J. 1987).  It interprets the New Jersey state constitution as affording New Jersey citizens greater protection against

unreasonable searches and seizures and rejects the good faith exception based on the impact its adoption would have on the privacy rights of New Jersey citizens and on the procedures employed by New Jersey's criminal justice system.

## CRIMINAL PROCEDURE – WARRANT REQUIREMENT – GOOD FAITH EXCEPTION – CONFLICT OF LAWS

The criminal act is the murder and robbery in Maryland of two Maryland citizens by another Maryland citizen. New Jersey was involved only because appellant had left Maryland and went to New Jersey. The investigation, arrest, and searches were a joint law enforcement effort involving officers from Maryland and New Jersey in addition to the federal Marshals Service. Nothing in the record suggests that the Maryland police were consciously trying to evade Maryland law. Application of the good faith exception will not impact the privacy rights of New Jersey citizens or impair or negatively disrupt the procedures employed in New Jersey's criminal justice system. Whatever interest New Jersey may have in the process by which the evidence was obtained, Maryland has the greater interest in the case. Maryland law and the good faith exception apply because the warrants are not so obviously deficient that they could not have been reasonably relied upon by the officers in good faith.

## CRIMINAL PROCEDURE – WARRANT REQUIREMENT – GOOD FAITH EXCEPTION

The good faith exception applies as long as the warrant is not based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or is not so facially deficient otherwise that the executing officers cannot reasonably presume it to be valid. The applicability of the good faith exception is reviewed de novo when the facts are not in dispute.

## CLOSING ARGUMENT – PLAIN ERROR

The trial court's allowing the prosecutor's unobjected to statement during closing argument that there were tensions based on race between appellant and the victim was not a clear or obvious error such that plain error review is warranted.

Circuit Court for Cecil County
Case No. K-15-470

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 510

September Term, 2017

_____

DERRICK L. CARROLL

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Berger,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Kenney, J.

_____

Filed: May 2, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Earl and Mary Ann Loomis were murdered during a home invasion in Port Deposit, Maryland in February 2015. A jury in the Circuit Court for Cecil County convicted appellant Derrick L. Carroll of two counts of first-degree murder in addition to multiple conspiracy counts in regard to that event.

On appeal, appellant presents two questions for our review:

1. Did the trial court err in denying appellant's motion to suppress evidence?

2. Did the trial court plainly err in permitting the prosecutor to argue that appellant's motive was racial animosity?

For the reasons that follow, we affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prior to February 22, 2015

The Loomises were the grandparents of appellant's ex-wife, Kimber Carroll, who considered them her parents. It appears that appellant's relationship with the Loomises may have been initially cordial, but had deteriorated over time. According to Ms. Carroll's testimony, when she and appellant were dating in 2012 and she was living with the Loomises, she would sometimes sneak appellant into their house where he stayed without her grandparents' knowing. She explained that he was not "allowed to stay there" because of how the Loomises "felt about him," and that he had expressed to her that the Loomises disliked him. After Ms. Carroll and appellant married and moved into an apartment, the Loomises changed the locks to their home, and their relationship with her deteriorated as a result of her drug addiction. Appellant also used drugs and sold them.

Ms. Carroll's aunt testified that the week before the murder, Mrs. Loomis told her that she didn't like appellant and that she wanted her niece to "straighten out" and "stay away" from him. Appellant testified that he had had a good relationship with Mrs. Loomis, who was not opposed to him staying at the house, but he acknowledged that Mr. Loomis had expressed concerns about Ms. Carroll and appellant being together.

Both Ms. Carroll and appellant testified about an incident that happened in 2013, when, at the time, she and appellant had split up, and she was living with the Loomises. According to Ms. Carroll, she was due in court that day, and appellant stopped by their house to take her there. Mr. Loomis indicated that he would be the one to take her to court. Appellant and Mr. Loomis argued, and appellant attempted to get into the house. The confrontation ended in about ten minutes.

Appellant testified that the incident related to a custody hearing for their daughter, who was in foster care at the time. Appellant and his then fiancée, Lauren Bucaro, would be awarded custody, but only if Ms. Carroll consented. Appellant testified that, when he went to the Loomises' house to pick her up for the hearing, Mr. Loomis said that he would take her to court. Appellant and Mr. Loomis argued, but appellant did not attempt to enter the house and left after Mr. Loomis asked him to. He felt no ill will towards the Loomises because they helped support his daughter and he was grateful for that.

Appellant's mother, who had also helped care for appellant's daughter, testified that she maintained a good relationship with the Loomises. And, in a statement to police, appellant's girlfriend at the time, Kayla Way-Nunley, stated that appellant never spoke ill about Ms. Carroll's family.

2

**February 22 and 23, 2015**

At trial, witnesses gave conflicting accounts as to what took place on the night of February 22, 2015 and the following day. There is no dispute, however, that on the night of February 22, there was a gathering, referred to by witnesses as a "tattoo party," at Ellen Lough's trailer in Port Deposit with at least seven individuals present. They included appellant, Ellen Lough, London Anderson, Azu Azuewah, Ashley Browe, Kayla Way-Nunley, and a person known as "Hummer."[1]

Anderson[2] testified that he was friends with Azuewah, that Lough was Azuewah's long-term girlfriend, and that he spent a lot of time in their trailer. During the party, appellant got tattooed on his hands by Hummer. According to Anderson, on the morning of February 23, appellant entered the trailer with "a couple of cases of guns, ammunition," and a blue or green Chevy S-10 truck was parked outside. Anderson helped appellant bring the guns inside. When Anderson asked appellant where he obtained the guns, appellant said that he had "robbed . . . his daughter's grandparents,"[3] and had "duct-taped their faces until they couldn't breathe."

---

[1] We will refer to these individuals, except Hummer, who did not testify, by their last name.

[2] At the time of trial, Anderson and Ms. Carroll had been dating for about two years and were living together. He and Ms. Carroll testified that they did not know each other in February 2015, and that they started dating a month or two afterwards. According to Anderson, they had not discussed their testimony.

[3] As noted earlier, Ms. Carroll considered the Loomises her parents.

3

Anderson testified that appellant, Lough, Azuewah, and Hummer discussed dumping the S-10 near White Marsh. They left the trailer to do so with appellant taking a taxi and the others riding in the S-10 or Lough's car. After returning to the trailer, Anderson slept; when he woke up, the guns were gone. Anderson denied any involvement in the burglary or murders, or that he had gone to the Loomises' house. He did not contact the police because he was scared.[4]

Browe testified that she was staying at Lough's trailer in February 2015. On the night of February 22, appellant was present at the tattoo party, along with Anderson and Azuewah, and got hand tattoos. Between 5:00 and 7:00 a.m. on February 23, Browe awoke to the sounds of appellant entering the trailer, bringing in "bags of guns" and saying "[y]ou guys left me."

Way-Nunley, who was, at the time, appellant's girlfriend, testified that she and appellant attended the tattoo party on the night of February 22, along with Anderson and

---

[4] Anderson had been interviewed by the police on March 20, 2015, and a recording of the interview was played for the jury. His narrative during the interview is similar to his trial testimony, but some facts differed. In the police interview, Anderson stated that, on the morning of February 23, appellant entered the trailer and argued with Azuewah. Appellant pulled a gun, threatened Azuewah, saying "you left me up there." Appellant then started bringing in guns from a blue or green truck. Lough was "freaking out" because appellant was bringing the guns into her trailer. According to Anderson, appellant started a fire in the grill near the trailer, and burned clothing and paperwork. Anderson joined appellant and burned drugs he found in the trailer because he did not "want it to look like a big drug house." Eventually, appellant, Way-Nunley, Lough, and Azuewah left. They took Lough's car and the S-10 and left the guns in the trailer. Anderson denied that anyone said where the guns came from. He also specifically denied that appellant mentioned a robbery. He did mention that appellant had confronted him and expressed concern that he was "a snitch." Detectives testified that Anderson told them that appellant had admitted to committing a robbery, once the recorded portion of Anderson's statement was over.

4

Browe. When she woke up the next morning at 8:00 a.m., appellant was present and Anderson was gone. She saw a blue truck outside the trailer, which she and appellant drove to White Marsh. Lough and Azuewah followed in their car. According to Way-Nunley, she did not see any guns, jewelry, or documents.[5]

Way-Nunley gave police two statements which were played for the jury. In the first statement on February 26, 2015, she told police that she was with appellant throughout the night of February 22, and that they never left the trailer. However, Azuewah and Lough left and returned to the trailer repeatedly. Way-Nunley added that she can be a heavy sleeper and that appellant may have left without her knowing. If he "did anything" while she was asleep, "that's on him." She denied knowing anything about a crime.

In the second statement on March 17, 2015, Way-Nunley stated that, when she fell asleep on February 22, appellant was next to her watching television. She slept in a back room of the trailer, and when she woke up the next morning, she did not see any guns. But, she did overhear Lough arguing with Azuewah and asking, "why is this shit in here[?]" Appellant and Azuewah locked themselves in a bathroom and talked. At some point, Way-Nunley saw a greenish pickup truck parked outside, with Azeuwah in the driver's seat and appellant in the passenger seat. She was only "50 percent" sure about

_____

[5] When she testified, Way-Nunley was in jail for a probation violation and a drug charge. She stated that she did not expect to receive any benefit in exchange for her testimony and that she "just decided to come forward as a good citizen."

who drove, but the two of them dropped the truck off in a parking lot near Baltimore. She struggled to remember details because she was "pretty high that day."

Rebecca Garland lived in the trailer adjacent to Lough's. She testified that at about 8:30 a.m. on February 23, she saw a man whom she didn't know getting "black garbage bags out of the back of a blue pickup truck" that was "consistent with" Mr. Loomis's S-10. He was "hollering back and forth" with a woman whom Garland did not recognize. He and the woman took the bags into Lough's trailer. About an hour later, when Garland went outside to sit on her porch, the same man walked past her and they said "hi" to each other. When police asked Garland to identify the man shortly after the incident, she was unable to do so. But later, she was able to identify appellant based on an internet search of the Loomis murders, where his name and photograph appeared in a newspaper story. She did not, however, call the police to tell them. At trial, she identified appellant as the man that she saw.

Appellant testified that he and Way-Nunley came to the tattoo party and that he got his hands tattooed at approximately 9:00 p.m. Because his hands were sore and tender, he used heroin and drank a large amount of alcohol to numb the pain. He fell asleep in the trailer. When he awoke the next morning, Way-Nunley was with him. Anderson and Browe were not there, but eventually they returned to the trailer. Lough and Azuewah left that morning.

According to appellant, he did not leave the trailer on February 23. He repeatedly tried to call Azuewah, but Azuewah did not pick up. On February 24, when Azuewah and Lough had still not returned, he left in a cab. He did see and greet Garland, but on

6

the morning of February 24, not the 23rd. He never brought guns into Lough's trailer or unloaded anything from a truck, and he denied ever seeing guns or the S-10 truck.

### The Investigation, Arrest, and Search

Neighbors and family members testified that they had last spoken with Mr. and Mrs. Loomis on February 22, 2015. They were unable to reach them on February 23, and Mr. Loomis's blue S-10 truck was missing from the Loomises' driveway. When Ms. Carroll and her aunt went to the house to check on them on February 25, they found Mr. and Mrs. Loomis's bodies in an upstairs room with their hands and faces wrapped in duct tape. Both had died of asphyxia from being wrapped in tape. There were bleach stains on and around their bodies, which had sustained chemical burns. It was unclear whether the burns were sustained before or after they had died.

Although the S-10 was missing, Mr. Loomis's Ford Escape and Mrs. Loomis's Honda CRV were still in the driveway. The Escape had been "rummaged" through, and papers were spread throughout the vehicle. Ms. Carroll's aunt believed that there was a "good possibility" that Mr. Loomis kept important papers in the Escape.

The house had also been ransacked. Fire extinguisher fluid, bleach, and cleaning products had been sprayed throughout the house, which prevented the police from collecting forensic evidence. Mr. Loomis was a gun collector, and Mrs. Loomis collected jewelry; both the gun safe and jewelry boxes had been emptied. Mrs. Loomis's home office had not been "disturbed," but papers were strewn about Mr. Loomis's home office, and an "extreme amount" of fire extinguisher fluid had been sprayed throughout the room. Mr. Loomis's will was found in his home office.

7

Ms. Carroll was not a beneficiary under the will. She testified that the Loomises told her they were leaving their money to her aunt, who would "take care of" her.[6] While Ms. Carroll denied ever saying that she expected to inherit from the Loomises, appellant testified that Ms. Carroll had told him that she expected to inherit a large sum of money from them. Lauren Bucaro testified that Ms. Carroll had told her that "her grandparents weren't giving her money anymore," but "if anything would ever happen to them that she would be very well off."

Appellant's mother, who had maintained a relationship with Ms. Carroll, testified that Ms. Carroll called her on February 25 and said that she was going to check on the Loomises. She called again shortly thereafter and said they were dead. According to appellant's mother, Ms. Carroll expressed "[n]o feelings, no crying, nothing." Shortly after the funeral, Ms. Carroll called her again and asked how she could find out if Mr. and Mrs. Loomis had another will. Ms. Carroll denied having spoken to appellant's mother.

Mr. Loomis's S-10 was found in a parking lot in Perryville on February 26. Detectives traced the Loomises' bank records and obtained video of Lough using their bank card after they had been killed. Documents that belonged to Mr. Loomis and a ski mask were later found inside Lough and Azuewah's car.[7]

---

[6] Her aunt testified that she disapproved of Ms. Carroll's lifestyle, "did not associate with [her] if I did not have to," and avoided being at the Loomises' house when Ms. Carroll was present.

[7] When called to testify, Lough invoked her Fifth Amendment privilege.

Having developed appellant as a suspect in the robbery and homicide of the Loomises, law enforcement, on February 26, 2015, learned that he had gone to Trenton, New Jersey and was in the area of 27-29 Bryn Mawr Avenue. And, because there was an outstanding arrest warrant for appellant for an earlier robbery in Elkton on February 9, members of the U.S. Marshal's Office Fugitive Task Force ("U.S. Marshals") began surveillance of the Bryn Mawr Avenue residence. They observed appellant exit this residence, carrying a white trash bag, and walk down the sidewalk and out of view between 57 and 59 Bryn Mawr Avenue. When he reemerged without the white bag, the U.S. Marshals took him into custody. They then proceeded to the side of 59 Bryn Mawr Avenue, where they observed three black garbage bags, one of which was open with a white bag on top.

That same day, a police officer from the Mercer County Homicide Taskforce, after conversing with Cecil County police officers, prepared an affidavit in support of a search warrant to search the residence at 27 Bryn Mawr Avenue where appellant had been staying and the black garbage bag with the white bag on top.

The affiant, Sergeant Paul Toth of the Mercer County Homicide Taskforce, stated, in pertinent part:

> I have probable cause to believe and do believe that evidence relating to the death of Earl Loomis and Mary Ann Loomis may be present within a certain residence and a black garbage bag.
>
> * * *
>
> The facts tending to establish the grounds for the application and probable cause for my belief that such grounds exist are as follows:
>
> a. An investigation involving the Cecil County Sheriff's Office and the Mercer County Homicide Task Force is being conducted into the death of

9

Earl Loomis and Mary Ann Loomis that occurred in Elkton, Maryland on February 25, 2015. On Wednesday, February 25 2015, the Cecil County Sheriff's Office in Maryland responded to the address of 106 West Parkway in Elkton, Maryland after receiving a call for service in reference to suspicious circumstances.

b. Cecil County Sheriff's Office arrived at 106 West Parkway and located the bodies of two deceased persons in an upstairs bathroom area. The two bodies appeared to have been bound by duct tape at the hands and feet with tape also wrapped around the faces of each person. The two bodies were identified at [sic] Earl Loomis and Mary Ann Loomis.

c. Derrick Carroll, date of birth June 18, 1989 had an arrest warrant issued for Robbery (Home Invasion) that occurred in Elkton, Maryland on February 9, 2015. Derrick Carroll was identified as a suspect in the Robbery Home Invasion that occurred in Elkton, Maryland on February 9, 2015. Derrick Carroll is also a suspect in the homicide of Earl Loomis and Mary Ann Loomis.

d. On Thursday, February 26, 2015, members of the United States Marshal's Office Fugitive Taskforce received information that Derrick Carroll may be at a residence in the area of 27-29 Bryn Mawr Avenue, Trenton, New Jersey. [U.S. Marshals] began surveillance of the Bryn Mawr Avenue homes. [U.S. Marshals] observed Derrick Carroll exit the residence at 27 Bryn Mawr Avenue, Trenton, New Jersey. They further observed Derrick Carroll was carrying a white trash bag. They observed Carroll walk down the sidewalk on Bryn Mawr Avenue towards Volk Street, Trenton, New Jersey.

e. Investigator Dean Wylie from the [U.S. Marshals'] Taskforce observed Derrick Carroll walk between 57 and 59 Bryn Mawr Avenue while carrying the white trash bag. Approximately fifteen seconds later, Derrick Carroll was observed exiting back out from between 57 and 59 Bryn Mawr Avenue without the white trash bag in hand. [U.S. Marshals] then took Derrick Carroll into custody.

f. Once Derrick Carroll was in custody, Investigator Dean Wylie proceeded to the side of 59 Bryn Mawr Avenue where he observed 3 black colored garbage bags on the side of 59 Bryn Mawr. Investigator Wylie noticed one black garbage bag open with a white bag on the top.

I therefore have probable cause to believe that evidence relating to the death of Earl Loomis and Mary Ann Loomis may be present within the

10

above residence, same being: 27 Bryn Mawr Avenue, Trenton. New Jersey and also a black colored trash bag which also contains a white trash bag and is located along side of 57 and 59 Bryn Mawr Avenue, Trenton, New Jersey.

\* \* \*

Wherefore, I respectfully request permission to search the aforementioned residence and trash in order to find and seize any evidence relating to the death of Earl Loomis and Mary Ann Loomis including but not limited to any clothing, weapons, projectiles, fingerprints, blood or other bodily fluid, fibers, hairs, photographs, video tapes, digital media storage devices, cellular telephones, computers, pagers, diaries, journals, mail, personal paperwork, personal identification, controlled dangerous substances and any other evidence that may lead to the discovery of [] any additional witnesses or suspects.

A New Jersey Superior Court judge issued two search warrants: one for the residence and one for the garbage bag described in the affidavit.

Inside 27 Bryn Mawr Avenue, the police recovered a cell phone, a stained sweatshirt, a box of ammunition, a holster, and three ski masks, one of which contained the DNA of Azuewah and another the DNA of Lough. The cell phone contained texts to Lough that read "yo, like WTF is going on. Are yall serious. Yall are fucking everything up"; "call me and let me know yall safe"; "only we can get us in some B.S. Just know that I love yall, and I had fun at the tattoo party"; and "tell Zo...to call me, please."

From inside the garbage bag, police recovered a black handbag, a key to the Loomises' house, a key for Mrs. Loomis's Honda, a Ruger weapon magazine end cap, and a Ruger key.[8] DNA evidence offered at trial indicated that Mr. and Mrs. Loomis could not be excluded as contributors to DNA found in the handbag, and that Mrs. Loomis was the sole contributor of DNA found on one of the keys.

---

[8] The key is a safety feature that locks and unlocks the firearm.

## DISCUSSION

## I.

## Suppression of Evidence

Before trial, appellant filed a motion to suppress the evidence obtained from the searches of 27 Bryn Mawr Avenue and the garbage bag. He contended that the search warrants were defective and that no reasonably well-trained officer should have relied on them. The trial court denied the motion, finding that there was sufficient probable cause shown within the four corners of the warrants and application for the judge to have issued them. And, even if there was not, the officers executing the warrants had relied on them in good faith. As to the garbage bag, the court also "guess[ed] someone could make the argument that it was abandoned."

At trial, the State introduced into evidence items obtained from the two searches. From the apartment, the cell phone text messages and ski masks containing codefendants' DNA were introduced; from the garbage bag, the key to the Loomises' house, the key for Mrs. Loomis's Honda, the Ruger key, and the handbag were introduced.

### *Standard of Review*

The Fourth Amendment to the U.S. Constitution and Article 26 of the Maryland Declaration of Rights protect persons, their houses, and effects from unreasonable searches. As a general proposition, searches require a warrant to be based on probable cause and that the place to be searched and what is to be seized be identified.[9]

---

[9] The Fourth Amendment provides:

The Court of Appeals has explained the standard of appellate review of a search warrant:

> We determine first whether the issuing judge had a substantial basis to conclude that the warrant was supported by probable cause. We do so not by applying a de novo standard of review, but rather a deferential one. The task of the issuing judge is to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability that contraband or evidence of a crime will be found in a particular search. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

*Greenstreet v. State*, 392 Md. 652, 667-68 (2006) (cleaned up).

Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) (quoting *Gates*, 462 U.S. at 231-32). Because "[a] grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant," we do not "invalidate . . . warrant[s] by interpreting affidavit[s] in

---

(…continued)

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article 26 provides:

> That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

a hypertechnical, rather than a commonsense, manner." *Gates*, 462 U.S. at 236 (cleaned up). Instead, we review warrant affidavits "in a commonsense and realistic fashion, keeping in mind that they are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *State v. Faulkner*, 190 Md. App. 37, 47 (2010) (citations omitted). In other words, we "view the factual recitations in the warrant application in the light most favorable to the State," and accept the issuing judge's implicit fact-finding, unless clearly erroneous. *Ellis v. State*, 185 Md. App. 522, 535 (2009). And, we resolve "[d]oubtful or marginal cases . . . in favor of the judge's decision to issue the warrant." *Lindsey v. State*, 226 Md. App. 253, 262 (2015).

That said, the "great deference" we accord the issuing judge's determination, *Ferguson v. State*, 157 Md. App. 580, 593 (2004), is not boundless. The issuing judge must "not serve merely as a rubber stamp for the police," and "the affidavit supporting the warrant application [must] not be based on reckless falsity." *Greenstreet,* 392 Md. at 668-69 (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)). In short, a finding of probable cause cannot rest on "affidavits which are purely conclusory." *Scott v. State*, 4 Md. App. 482, 489 (1968).

### Contentions

Appellant contends that the affidavit supporting the warrant did not establish a "substantial basis for the issuing judge to conclude that there was probable cause" to believe appellant was involved in the Loomises' robbery and homicide, and that a "nexus between [that] crime and the places to be searched" existed. And, in response to the suppression court's determination that, even if there was not probable cause for the

14

warrants, the officers executing them relied on them in good faith, he asserts that the warrants were so "obviously deficient" that "no trained officer could reasonably have concluded otherwise."

More particularly, he contends that "the law of the state where a search was conducted controls" motions to suppress evidence, in this case New Jersey, and that the New Jersey Supreme Court, interpreting the New Jersey constitution, (1) has expressly refused to adopt a good faith exception to the warrant requirement, and (2) has held that the search of discarded garbage bags must be conducted pursuant to a valid warrant.[10]

Appellant further asserts that the admission of evidence obtained from the searches was not harmless beyond a reasonable doubt. And, to the extent that trial counsel may have waived a challenge to the search of the garbage bag, doing so was ineffective assistance of counsel.

The State responds that the issuing judge had a substantial basis to find a nexus between the criminal activity and the places to be searched, and therefore the warrants were sufficient. But, even if they were deficient, the evidence obtained in the searches

---

[10] In *State v. Hempele*, 576 A.2d 793, 810 (N.J. 1990), the New Jersey Supreme Court concluded that a "person has as much right to privacy in items concealed in a garbage bag as in items concealed in other opaque containers," and that the "[d]efendants had a reasonable expectation of privacy in the contents of their trash bags and can claim the protection of article I, paragraph 7 [of the New Jersey Constitution]." The *Hempele* Court held that "the State must secure a warrant based on probable cause in order to search garbage bags left on the curb for collection." *Id.* at 813. In that case, the defendants challenged warrantless searches by police officers of "white plastic trash bags from a plastic trash can" "sitting in front of" a rowhouse and "gray plastic garbage bags placed near the street" in front of a house. *Id.* at 796-97.

was admissible under the good faith exception because appellant did not preserve his claim that we are bound by New Jersey law, and the admissibility of evidence is governed by the law of Maryland as the "forum state."

As to the ineffective assistance of counsel claim, the State contends that the record in this case is inadequate to assess on direct appeal why appellant's trial counsel waived argument as to the garbage bag search and did not argue that New Jersey law applied. In addition, the State argues that appellant was not prejudiced because, under either New Jersey or Maryland law, the garbage bag would be considered abandoned.[11] Moreover, it argues that, at trial, the State relied on the testimony of eyewitnesses, who implicated appellant for the crimes, and not on the search evidence. Therefore, any errors in the admission of evidence recovered with searches would be harmless.

*Analysis*

To determine whether an issuing judge had a substantial basis to find probable cause, we "ordinarily" look only "to the information provided in the warrant and its

---

[11] More specifically, the State argues that, even under New Jersey law, appellant cannot find relief because he had abandoned the garbage bag in an alleyway well beyond his "curtilage" or "curb." In Maryland, "if a person voluntarily discards or otherwise relinquishes his interest in property so that he no longer retains a reasonable expectation of privacy with regard to it, he has removed himself from the protection of the fourth amendment." *Morton v. State*, 284 Md. 526 (1979). In New Jersey, according to the State, "if the State can show that property was abandoned, a defendant will have no right to challenge the search or seizure of that property." It cites *State v. Johnson*, 940 A.2d 1185, 1196 (N.J. 2008) (holding that the defendant had standing to challenge search of a duffel bag that he had picked up with his hands within a home, but which he disclaimed owning when asked by police), and *State v. Carvajal*, 996 A.2d 1029 (N.J. 2010) (holding that an unclaimed duffel bag left on a bus was abandoned where defendant denied having any possessory or ownership interest in it, and every other bus passenger denied owning it).

accompanying application documents." *Greenstreet v. State*, 392 Md. 652, 669 (2006).

In *Potts v. State*, 300 Md. 567 (1984), the Court of Appeals determined that the totality of

the circumstances analysis set forth in *Illinois v. Gates*, 462 U.S. 213 (1983), and

*Massachusetts v. Upton*, 466 U.S. 727 (1984), was, under both the Fourth Amendment

and Article 26, the appropriate standard of review of a probable cause determination.

Probable cause may be established by either, or both, the direct observation of the affiant,

or hearsay information furnished to the affiant. *See Donaldson v. State*, 46 Md. App.

521, 523 (1980).[12] And, where an affidavit "taken as a whole creates a fair inference that

a particular unsubstantiated assertion is probably correct, probable cause may be found to

exist." *Potts*, 300 Md. at 575.

As to nexus, appellant argues that the trial court erred in denying the motion to

suppress the evidence recovered from the searches because there was no "sufficient nexus

between the (1) criminal activity, and (2) the things to be seized, and (3) the place to be

searched." He cites *Agurs v. State*, 415 Md. 62, 84 (2010) ("Our interpretation of the

nexus requirement is sufficiently well-established that the police must be aware of it."),

and *State v. Ward*, 350 Md. 372, 400 (1998) (Bell, C.J., dissenting) ("[I]t is still necessary

---

[12] In *Gates*, the Supreme Court abandoned the two-prong *Aguilar* [*v. Texas*, 378 U.S. 108 (1964)] and *Spinelli* [*v. United States*, 393 U.S. 410 (1969)] test, which required the issuing magistrate be informed of some of the underlying circumstances from which it was concluded that incriminating evidence would be found where it was claimed to be and that an informant was credible and the information was reliable. *See Potts*, 300 Md. at 570-71.

17

that there be a sufficient nexus between (1) criminal activity, and (2) the things to be seized, and (3) the place to be searched.").[13]

In this case, Sergeant Toth, the affiant, described the following criminal activity:

On Wednesday, February 25, 2015, the Cecil County Sheriff's Office in Maryland responded to the address of 106 West Parkway in Elkton, Maryland after receiving a call for service in reference to suspicious circumstances.

Cecil County Sheriff's Office arrived at 106 West Parkway and located the bodies of two deceased persons in an upstairs bathroom area. The two bodies appeared to have been bound by duct tape at the hands and feet with tape also wrapped around the faces of each person. The two bodies were identified at [sic] Earl Loomis and Mary Ann Loomis.

As to appellant, the affidavit states that he was "identified as a suspect" in the February 9 robbery home invasion, for which an arrest warrant had been issued, and that he was "also a suspect" in the discussed criminal activity discovered on February 25. As to the place to be searched, the affiant states that on Thursday, February 26, 2015, U.S. Marshals, having "received information that Derrick Carroll may be at a residence in the area of 27-29 Bryn Mawr Avenue, Trenton, New Jersey," began surveillance of that area that same day and confirmed that information. They observed appellant "exit[ing] the residence at 27 Bryn Mawr Avenue," and "carrying a white trash bag." He walked down the sidewalk and into an alley at the side of 59 Bryn Mawr Avenue; he came out of the alley without the white trash bag. After apprehending appellant under the outstanding arrest warrant, Investigator Wylie proceeded to the side of 59 Bryn Mawr Avenue where

---

[13] In this argument, appellant does not cite New Jersey law, but, like Maryland, New Jersey has adopted the *Gates* totality of the circumstances test. *See State v. Novembrino*, 519 A.2d 820, 836 (N.J. 1987).

he observed three black colored garbage bags, one of which was open with a white bag on the top.

Appellant contends that the allegation that he was a "suspect" in the homicide is a conclusory statement unsupported by any facts contained in the affidavit. Citing *Braxton v. State*, 123 Md. App. 599, 623 (1998), he argues that the affidavit did not provide "any factual foundation for the officer's conclusory assertion" that appellant was a "suspect" in the homicide. And, even assuming he was a "suspect," appellant asserts that "the mere observation, documentation, or *suspicion* of [his] participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found" at or in the vicinity of 27 Bryn Mawr Avenue. *Holmes v. State*, 368 Md. 506, 523 (2002) (emphasis added).

The State responds that the U.S. Marshals had "received information" that Derrick Carroll was at a residence around 27 Bryn Mawr Avenue, and that the reliability of that information was corroborated, as in *Gates*, when officers observed appellant leaving that precise location.

To be sure, probable cause for a warrant may be based on information obtained through an investigation in collaboration with law enforcement from other federal or state jurisdictions. For example, in *Winters v. State*, 301 Md. 214 (1984), Maryland State Police, the FBI, and the DEA were investigating narcotics trafficking in a "cooperative law enforcement venture," and a federal search warrant was being executed. *Id.* at 230. A state police officer was authorized to assist in the search and, while legally on the premises, he observed evidence of a Maryland crime. The state police officer relied on

19

that observation in an application for a state search warrant, attaching the federal warrant, but not the affidavit supporting the federal warrant. *Id.* at 221-22, 231. The Court of Appeals held that "there was no primary illegality in the federal search," and that it was "proper to use the evidence [] discovered during the [federal] search to form the basis for the existence of probable cause in the state warrant." *Id.* at 231. In addition, this Court has stated, when a police officer relies on information communicated to him or her from another police officer and *recites that information in the affidavit*, "that the affiant's sources of information were reliable is too plain to require discussion." *Grimm v. State*, 6 Md. App. 321, 328 (1969); *see also Commonwealth v. Banville*, 931 N.E.2d 457 (Mass. 2010).[14]

In this case, there was a clear nexus between appellant and the places to be searched, i.e., the garbage bag and the residence. U.S. Marshals verified the information provided to them and they observed appellant exiting the residence and leaving the garbage bag in the alley. It would be a reasonable inference in this joint investigation that appellant, who apparently left Maryland shortly after the February 22-23 incident, would still have evidence of the robbery and homicide in close proximity to him until he could use it for his benefit or discard it so it could not be found.

The affidavit provides meaningful information about the murder of the Loomises, but there is no information in the affidavit establishing why appellant was "also a

---

[14] The Supreme Judicial Court of Massachusetts addressed an investigation of a rape and murder in Massachusetts and whether evidence seized under a Maryland issued search warrant was admissible. It held that the issuing Maryland judge properly relied on an affidavit of a Massachusetts police officer.

suspect" in the Loomises investigation. Certainly, the collective knowledge of the Maryland police, the New Jersey police, and the U.S. Marshals could have provided a substantial basis for finding probable cause, but none was recited in the four corners of the warrant application. In short, that appellant was "also a suspect" in the Loomises investigation was a "purely conclusory" statement. *See Scott*, 4 Md. App. at 489. After granting great deference to the issuing judge and viewing the factual recitations in the warrant application in the light most favorable to the State, we are not persuaded that the issuing judge had a substantial basis for finding probable cause for the warrants. For that reason, we turn our attention to the trial court's good faith finding.

On appeal, appellant argues that the searches of the residence and the garbage bag were governed by New Jersey law, and that New Jersey has expressly refused to adopt the good faith exception to the warrant requirement. The State responds that appellant argued at the suppression hearing only that no reasonably well-trained officer would have relied on the warrants and did not preserve his claim that New Jersey law applies to the good faith exception. We agree, but because the suppression court found that the officers executed the warrants in good faith reliance, the good faith exception is properly before us on appeal. *See Greenstreet*, 392 Md. at 667 ("[B]y [the trial court's] finding that the good faith exception did not apply . . . the good faith exception properly is before us."). And, in considering it and appellant's ineffective assistance of counsel claim, we will address whether New Jersey law or Maryland law applies.

The United States Supreme Court and the Maryland Court of Appeals have adopted a good faith exception to the warrant requirement, under which "evidence seized

21

under a warrant subsequently determined to be invalid may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant." *McDonald v. State*, 347 Md. 452, 467 (1997); *see United States v. Leon*, 468 U.S. 897, 919-22 (1984). The exception applies as long as the warrant is not "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or is not "so facially deficient [otherwise] that the executing officers cannot reasonably presume [the warrant] to be valid." *McDonald*, 347 Md. at 468-69 (quoting *Leon*, 468 U.S. at 923). As the Court of Appeals has observed, quoting the *Leon* Court, "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Patterson v. State*, 401 Md. 76, 104 (2007) (quoting *Leon*, 468 U.S. at 922). We review "a [trial] court's determination as to the applicability of the *Leon* good faith exception to the exclusionary rule . . . de novo when the facts are not in dispute." *Id.* at 104-05.

The New Jersey Supreme Court has interpreted its state constitution to "afford [its] citizens greater protection against unreasonable searches and seizures than does the [F]ourth [A]mendment," and has expressly declined to adopt the *Leon* good faith exception to the exclusionary rule. *See State v. Novembrino*, 519 A.2d 820, 850 (N.J. 1987).[15]

---

[15] The *Novembrino* Court explained:

Appellant contends, citing *Moore v. State*, 71 Md. App. 317 (1987), and *Myers v. State*, 395 Md. 261 (2006), that even if a trained police officer could reasonably believe "that the warrant was adequate," the admission of the evidence should be governed by New Jersey law as the state in which the searches were conducted. The State, on the other hand, views the admission of evidence obtained in connection with a deficient search warrant as a procedural concern, and citing *Mason v. Lynch*, 388 Md. 37, 39 n.1 (2005) ("the admission into evidence of the photographs . . . is an issue governed by the law of the forum and not by the law of the place where the accident occurred"), it argues that the admission of evidence is "governed by the law of the forum."

---

(…continued)

> Our conclusion as to [whether to adopt the good faith exception] is strongly influenced by what we perceive to be the likely impact of our decision on the privacy rights of our citizens and the enforcement of our criminal laws, matters of 'particular state interest' that afford an appropriate basis for resolving this issue on independent state grounds.
>
> * * *
>
> The exclusionary rule, by virtue of its consistent application over the past twenty-five years, has become an integral element of our state-constitutional guarantee that search warrants will not issue without probable cause. Its function is not merely to deter police misconduct. The rule also serves as the indispensable mechanism for vindicating the constitutional right to be free from unreasonable searches. Because we believe that the good-faith exception to the exclusionary rule adopted in *Leon* would tend to undermine the constitutionally-guaranteed standard of probable cause, and in the process disrupt the highly effective procedures employed by our criminal justice system to accommodate that constitutional guarantee without impairing law enforcement, we decline to recognize a good-faith exception to the exclusionary rule.

519 A.2d at 850, 856-57.

In *Moore*, we considered "the application of the arrest jurisdiction's law to the question of probable cause":

> Since the arrest occurred in the District of Columbia, under the ruling in *Berigan v. State*, 2 Md. App. 666, 668 (1968), we apply that jurisdiction's "law" *in testing the validity of the arrest*. While the *Berigan* Court did not delineate what it meant when referring to the "law" of the arrest jurisdiction, the word "law" must refer to the particular statutes and constitutional provisions of that jurisdiction. Where those statutory and constitutional provisions are not in contravention of the United States Constitution, and *to the extent that they expand an arrestee's rights*, clearly those provisions control any decision concerning the validity of an arrest. If the word "law" in *Berigan* meant case law interpreting federal constitutional law, under the principles of federalism, a sister state's constitutional interpretation would not necessarily be binding in this State. Where, however, that sister state's interpretation is persuasive, as was the case in *Berigan*, a Maryland court may adopt that jurisdiction's analysis.

71 Md. App. at 322-23 (emphasis supplied). And, in *Myers*, the Court of Appeals concluded that "[w]e have long recognized that the legality of [an] arrest and, therefore, the reasonableness of the search and seizure incident to the arrest, turns on the law of the State in which the arrest was made, absent a controlling federal statute." 395 Md. at 275 (citations omitted).

States have diverged on the approach to take when evidence obtained in a search, if judged by the law in the jurisdiction where the search occurred, would be inadmissible in that jurisdiction based on a local statute, court rule, or state constitutional provision. *See generally* LaFave, 1 Search & Seizure § 1.5(c) (5th ed.). LaFave explained:

> The issue . . . is best viewed simply as one of whether, *as a matter of policy, it would be sound to exclude the fruits of a violation of local law occurring in a jurisdiction other than that in which the prosecution is pending*. Stated differently, one might ask whether, given the tendency of jurisdictions to enforce many of their own local search and seizure

requirements by exclusion [], the same respect should be afforded local requirements elsewhere. That is a question of some difficulty[.]

*Id.* (emphasis added).

In general terms, states have adopted one of four different approaches: "(1) a mechanical approach determined by the law of the forum State;[16] (2) a significant relationship approach that looks to which State has the greater interest in the process by which the evidence was obtained;[17] (3) a governmental interest approach that weighs the interests of the forum State against those of the State where the evidence was obtained;[18] and (4) an exclusionary rule approach based on the underlying policies of the respective exclusionary rules of the States involved."[19] *Commonwealth v. Banville*, 931 N.E.2d 457, 464 n.1 (Mass. 2010) (providing a general overview of the four approaches). The first approach is mechanical; the other three ask the court to weigh the interests and policies of the involved states. The question of what approach we should adopt is one of first impression.

---

[16] *E.g.*, *State v. Lynch*, 969 P.2d 920 (Mont. 1998); *State v. Davis*, 834 P.2d 1008 (Or. 1992); *People v. Price*, 431 N.E.2d 267 (N.Y. 1981); *Burge v. State*, 443 S.W.2d 720 (Tex. Crim. App. 1969).

[17] *E.g.*, *People v. Saiken*, 275 N.E.2d 381, 385 (Ill. 1971).

[18] *E.g.*, *State v. Briggs*, 756 A.2d 731, 739-40 (R.I. 2000); *People v. Orlosky*, 115 Cal. Rptr. 598, 601 (Cal. Ct. App. 1974).

[19] *E.g.*, *State v. Torres*, 262 P.3d 1006, 1021 (Haw. 2011); *State v. Mollica*, 554 A.2d 1315 (N.J. 1989); *Echols v. State*, 484 So.2d 568, 571-72 (Fla. 1985); *State v. Lucas*, 372 N.W.2d 731 (Minn. 1985).

25

The *Banville* Court noted that although "the trend is towards the exclusionary rule approach, based on the validity of the warrant in the State where it was issued," this area of the law is "by no means clear or settled." *Id.* For example, some states, holding that the law of the sister state applies, "provide an exception for searches conducted as a cooperative effort between police of the two States: the law of the forum State may control depending on the nature of the agency relationship and the motives of the police of the forum State." *Id.* (citing *State v. Bridges*, 925 P.2d 357 (Haw. 1996) ("if forum state police set out consciously to evade forum state law . . . [s]itus law should not be used to reward such schemes"); *State v. Mollica*, 554 A.2d 1315 (N.J. 1989) (motives of police relevant); *State v. Cauley*, 863 S.W.2d 411 (Tenn. 1993)).

Appellant and the State both urge a bright line rule: appellant argues for the law of the state where the search occurred, i.e., the situs state;[20] the State argues for the law of the forum state. The adoption of a per se (or mechanical) situs or forum rule is appealing because of its simplicity. But, we are not persuaded that a per se application of the situs law would always be appropriate. Appellant was not arrested under the warrants at issue in this case, but under a warrant related to a February 9 incident, and the items seized were not the product of a search incident to arrest. In short, we are not persuaded to extend *Moore* and *Myers*, which concerned arrest and searches incident to arrest, to a

---

[20] "[N]o court appears to have adopted a per se rule in favor of situs law." *See generally* Megan McGlynn, Note, *Competing Exclusionary Rules in Multistate Investigations: Resolving Conflicts of State Search-and-Seizure Law*, 127 Yale L.J. 406, 434 (2017).

*Leon* good faith exception analysis. Nor are we persuaded that a per se application of the "law of the forum" would always be appropriate.

Whatever analytical merit there may be in trying to fit Maryland into one of the general approaches adopted by our sister states, we are not certain that a one-size fits all approach will satisfy every factual context that may arise. For that reason, we will focus only on the application of the exclusionary rule in the context of this case. And, in doing so, we will borrow analytical considerations from some of the various approaches taken in other states.

The criminal act in this case is the murder and robbery in Maryland of two Maryland citizens by another Maryland citizen. The investigation, arrest, and searches were a joint law enforcement effort involving officers from Maryland and New Jersey in addition to the federal Marshals Service. Nothing in the record suggests that the Maryland police were consciously trying to evade Maryland law; New Jersey was involved only because appellant had left Maryland and went to New Jersey. In our view, whatever interest New Jersey may have in the process by which the evidence was obtained, Maryland has a greater governmental interest in the case.

As to the underlying policies of the two states regarding the exclusionary rule, the New Jersey Supreme Court rejected the good faith exception "on independent state grounds" based on the impact that its adoption would have on "the privacy rights of [its] citizens" and the "enforcement of [New Jersey] criminal laws." *See Novembrino*, 519

27

A.2d at 850.[21]  It views the purpose of the exclusionary rule as "not merely to deter police misconduct."  It is also an "indispensable mechanism" to protect the right to be free from unreasonable searches, and the adoption of the good faith exception would "disrupt the highly effective procedures employed by [New Jersey's] criminal justice system to accommodate that constitutional guarantee without impairing law enforcement."  *Id.* at 856-57.  Clearly, the application of the good faith exception in this case will, in no way, impact the privacy rights of New Jersey citizens or impair or negatively disrupt the procedures employed in New Jersey's criminal justice system.

The Court of Appeals "has not recognized an exclusionary rule for evidence seized in violation of Article 26 of the Maryland Declaration of Rights," *Agurs v. State*, 415 Md. 62, 102 (2010) (Barbera, J., dissenting), and has followed *Leon*, permitting "evidence seized under a warrant subsequently determined to be invalid [to] be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant." *McDonald v. State*, 347 Md. 452, 467 (1997); *and see Fitzgerald v. State*, 384 Md. 484, 520 (2004) (Greene, J., dissenting) (stating that the Court, regarding a canine sniff, should take an "opportunity" to "interpret Article 26 . . . so as to afford [Maryland] citizens greater protections than those as interpreted under the Fourth Amendment").

We hold that the good faith exception to the exclusionary rule applies here; that the warrants are not so obviously deficient that they could not have been reasonably relied upon by the officers in good faith; and that the evidence recovered from both the

---

[21] *See supra* note 15.

residence and the garbage bag was admissible at trial. Therefore, we need not address appellant's ineffective assistance of counsel claim[22] and the State's argument that the garage bag in this case was abandoned under both Maryland and New Jersey law.

## II.

### Closing Argument

Appellant contends that, at closing, the prosecutor, who had "attempted to elicit testimony showing that appellant clashed with Mr. Loomis over race," argued that appellant, who was black, killed Mr. and Mrs. Loomis, who were white, because of racial

---

[22]    Were we to address appellant's ineffective assistance of counsel claim, we would be guided by "the general rule that a claim of ineffective assistance of counsel is raised most appropriately in a post-conviction proceeding" because "ordinarily, the trial record does not illuminate the basis for the challenged acts or omissions of counsel." *In re Parris W.*, 363 Md. 717, 726 (2001). As this Court has stated, only "where the critical facts are not in dispute and the record is sufficiently developed to permit a fair evaluation of the claim, there is no need for a collateral fact-finding proceeding, and review on direct appeal may be appropriate and desirable." *Testerman v. State*, 170 Md. App. 324, 335 (2006).

We note that the transcript of the suppression hearing indicates that appellant's counsel at the beginning of the hearing requested a postponement because he had had only two weeks to look at the files and needed more time to become familiar with the case, but that appellant objected and chose to proceed against counsel's advice. The following colloquy between the court and appellant ensued:

The Court:    [I]f you stand by . . . proceeding today against your attorney's advice, if in fact you were found guilty of one or more of these charges, that may have a bearing on any post-conviction rights you may have later on down the road, where it might be difficult for you to say that you didn't have effective assistance of counsel when your counsel is recommending that the matter be postponed . . . . Do you understand that you may be waiving your ability to claim [] ineffective counsel?

Appellant:    Yes.

29

animosity. He argues that allowing such arguments before an all-white jury was so prejudicial that he was deprived of his right to a fair trial. Appellant concedes that his counsel did not object to the prosecutor's statements at trial and urges plain error review.

The prosecutor's relevant closing statements were:

So you have a person in Mr. Carroll who knows the victims. You have a person in Mr. Carroll who knows the house. You have a person in Mr. Carroll who I dare say to you had motive. He had knowledge of these people. And he can call Mrs. Loomis "mom" all he want, but you don't have to read too far between the lines to know what kind of relationship he had with Mr. Loomis. How many times did he refer to Mr. Loomis as being a traditional person? What was quite notable in his statement about his child of mixed race was that he said something to the effect of, notwithstanding being a traditional person, he still loved my child and did things for my child. You know what that means, don't you? *Don't check common sense at the door. We all know what racial tensions there are. We all know what he's talking about when he's talking about Mr. Loomis being traditional.*

Mr. Carroll – and I'm not suggesting to you that Mr. Carroll is right or wrong about this. I certainly don't know. I don't think any of you could possibly know whether or not Mr. Loomis really did have issue with race or not. But I suggest to you that it's, if not obvious, certainly implied that *you can read between the lines of what Mr. Carroll is saying, that he believed that Mr. Loomis did not approve of his granddaughter being involved with him because he's black.* Is that the be-all end-all when it comes to motive? No. I'm not going to suggest to you that's the be-all end-all. But could it be part of the motive? Sure.

(Emphasis added).

The State responds that the arguments about racial tension between appellant and Mr. Loomis were one of several arguments advanced about the motive for the crime and was rooted in evidence presented at trial, particularly appellant's testimony on direct examination. The prosecutor argued that appellant "felt slighted by" Mr. Loomis, which in turn, may have motivated him to target Mr. and Mrs. Loomis in a particularly brutal

30

murder. In response to the prosecutor's question whether he "believed that Mr. Loomis didn't like [him] or didn't approve of [him] because [he] [is] black," appellant answered:

> Not exactly true. Just from Kimber telling me that, you know what I mean, he would rather her be with somebody – that's what he believed. I got that - - I didn't get that information directly from him. He never told that to me directly. But Kimber hinted to me that her grandfather didn't like the fact that she had liked an African American man.

Plain error review is a "'rare, rare phenomenon,' undertaken only when the un-objected-to error is extraordinary." *Perry v. State*, 229 Md. App. 687, 710 (2016) (quoting *Pickett v. State*, 222 Md. App. 322, 342 (2015)). A four prong test guides the exercise of plain error review:

> First, there must be an error or defect[—]some sort of deviation from a legal rule[—]that has not been intentionally relinquished or abandoned . . . by the [defendant]. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the [defendant]'s substantial rights, which . . . means [that the defendant] must demonstrate that [the error] affected the outcome of the [trial] court proceedings. Fourth and finally, if the above three prongs are satisfied, the [appellate court] has the discretion to remedy the error[—]discretion [that] ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.

*Givens v. State*, 449 Md. 433, 469 (2016) (quoting *State v. Rich*, 415 Md. 567, 578 (2010)).

Trial courts give attorneys "great leeway in presenting closing arguments to the jury." *State v. Newton*, 230 Md. App. 241, 254 (2016) (quoting *Degren v. State*, 352 Md. 400, 429 (1999)).

> "Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom" and, in doing so, to "indulge in oratorical conceit or flourish." *Wilhelm v. State*, 272 Md.

31

404, 412-13 (1974).  As long as "counsel does not make any statement of fact not fairly deducible from the evidence his argument is not improper." *Id.* at 412.  "What exceeds the limits of permissible comment or argument by counsel depends on the facts of each case." *Smith and Mack v. State*, 388 Md. 468, 488 (2005).  Thus, the propriety of prosecutorial argument must be decided "contextually, on a case-by-case basis." *Mitchell v. State*, 408 Md. 368, 381 (2009).  Because "a trial court is in the best position to evaluate the propriety of a closing argument as it relates to the evidence adduced in a case," the exercise of its broad discretion to regulate closing argument will not be overturned "unless there is a clear abuse of discretion that likely injured a party." *Ingram v. State*, 427 Md. 717, 726 (2012).

*Anderson v. State*, 227 Md. App. 584, 589-90 (2016) (cleaned up).

Based on our view of the record, we are not persuaded that the prosecutor's argument was not fair comment on the evidence.  And, at the very least, any alleged error was not clear and obvious.  In short, we are not persuaded that plain error review is warranted in this case.

**JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**